**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　　*Plaintiff-Appellee*,

　　　　　v.

NANCY MAGENO,
　　　　　　　*Defendant-Appellant*.

No. 12-10474

D.C. No.
2:11-cr-00048-
JCM-CWH-7

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
September 10, 2013—San Francisco, California

Filed August 11, 2014

Before: J. Clifford Wallace, Raymond C. Fisher,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Wallace

## SUMMARY[*]

### Criminal Law

Reversing a conviction for conspiracy to distribute methamphetamine, the panel held that the prosecutors' several misstatements of fact during the closing argument encouraged the jury to convict the defendant on the basis of evidence not presented at trial, and there was a reasonable probability that the misstatements affected the outcome.

The panel considered the misstatement issue, even though the defendant did not raise it before the district court or in her opening brief, because the government raised the issue in its answering brief, and the government was not prejudiced.

The panel concluded that there was plain error; the error affected the defendant's substantial rights; and the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  The panel reversed the conviction and remanded the case to the district court.

Dissenting, Judge Wallace wrote that the prosecutorial misstatement argument was waived and that there was no plain error.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Mace J. Yampolsky (argued), Mace J. Yampolsky, Ltd., Las Vegas, Nevada, for Defendant-Appellant.

Adam M. Flake (argued), Assistant United States Attorney; Daniel G. Bogden, United States Attorney; Robert L. Ellman, Appellate Chief, Office of the United States Attorney, Las Vegas, Nevada, for Appellees.

---

**OPINION**

BERZON, Circuit Judge:

Nancy Mageno's godson, a leader of a methamphetamine conspiracy, did not speak English fluently, so Mageno translated telephone calls for him. As a result, Mageno was prosecuted for knowingly joining and participating in the drug conspiracy by fostering communication between its participants and her godson. In a separate disposition, we reject Mageno's argument that the evidence against her was insufficient to sustain the conviction. Here, we consider related issues commendably raised by the government itself on appeal: Did the prosecutors' several misstatements of fact during the closing argument encourage the jury to convict Mageno on the basis of evidence not presented at trial? If so, is there a reasonable probability that the misstatements affected the outcome? After determining that we should reach these questions although Mageno did not raise them, we answer both questions "yes," and reverse.

**I**

Mageno's godson, Jesus Guadalupe Felix Burgos, his wife, and his young son, lived with Mageno in a two-bedroom apartment in Las Vegas, Nevada. While Burgos lived with her, Mageno served as his informal English-Spanish translator. Drug deals were often the topic of the conversations Mageno translated. When the government indicted Burgos and eight others for conspiring to distribute a controlled substance, it indicted Mageno as well. Mageno was charged with two counts; one alleging that she, Burgos, and others conspired to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 846, and the other accusing her of distributing more than 50 grams of methamphetamine, in violation of 21 U.S.C §§ 841(a)(1), 841(b)(1)(A)(viii) and 18 U.S.C. § 2, on or about October 7, 2010.

The Drug Enforcement Agency began investigating methamphetamine distribution in the Billings, Montana area with the aid of an undercover officer, Agent Joseph Kirkland. After Kirkland purchased high-grade methamphetamine from two brothers in the Billings area, he traced the brothers' supplier to Las Vegas. The supplier, Paco Francisco Flores, eventually led Kirkland to Burgos, the individual the government now maintains was at the center of the distribution operation. Burgos identified himself to Kirkland as "Virrio," invited Kirkland to travel to Las Vegas to buy methamphetamine, and provided Kirkland with a phone number to contact him.

To help develop a case against Burgos and his associates, the government obtained a warrant to tap Burgos's phone. At Mageno's trial, the government introduced a total of five intercepted calls involving Mageno:

> (1) A September 22, 2010, phone call between an unknown man and Burgos, in which Mageno acted as a translator. The unknown man complained that, "[t]he stuff that I just got is garbage. It's full of cut . . . . it's like, looks like soap. I [cook] this up I look stupid." An agent testified that this meant the drugs were poor quality and could not be resold. The caller said that he was going to "take . . . the rock out of it" and wanted a "return on" the "other stuff."

> (2) An October 1, 2010, phone call between co-defendant John Asher, Burgos, and Mageno. Mageno translated for Burgos, saying to Asher: "He says right now he doesn't have anything. What he does have is not any good . . . . They're waiting for — the new shipment to come in."

> (3) An October 7, 2010, phone call between Kirkland and Burgos, in which Mageno translated as they arranged a meeting. Kirkland called Burgos on that day, the date of the planned Las Vegas transaction. During the call, Burgos had trouble communicating with Kirkland in English so Mageno translated part of the conversation. The questions and responses Mageno translated

facilitated the transaction by providing details about Kirkland's car, location and clothing. Mageno also conveyed a question from Kirkland as to "price," although Kirkland never specified the "price" was for drugs. Burgos's response to the "price" question, also translated by Mageno, was, "This time it's the same price. Next time he can give it to you cheaper because right now they're having a hard time."

(4) A November 4, 2010, phone call between an unknown caller and Burgos, with Mageno translating as they arranged a meeting. Mageno translated the unknown caller's description of his car.

(5) A November 17, 2010, phone call between a caller identified as "Paco"[1] and Mageno, in which Mageno hints that she is concerned that the phone might be tapped: When asked what was happening, Mageno responds that she "can't say over the phone."

The evidence at trial also included testimony that on November 17, 2010, just before the last intercepted call, Mageno was driving with Burgos and his family when they realized they were being followed. Mageno confronted the agent monitoring Burgos, demanding, "Why are you following me?" After that encounter, Mageno made Burgos and his family leave her apartment. But that was not the end

---

[1] It is not clear whether the "Paco" on this phone call was the same Paco who was involved with the drug distribution conspiracy.

of her relationship with Burgos. Not long after Burgos moved out, Mageno traveled with him and two others, including her son-in-law, to Yakima, Washington, which was asserted by the government to be a "known drug hub." She, Burgos, and the others were detained by drug enforcement authorities but no drugs were found in their car.

Testifying in her defense, Mageno explained that: she did not know the conversations she translated contained references to drugs and "was under the impression that it had to do with [Burgos's] work"; she asked Burgos about the phone calls, and he always said the calls had to do with his work as a day laborer; Burgos told her the first call was a complaint about shoddy workmanship in the laying of cement; she understood that when the caller complained that he couldn't "cook" the product, he was referring to mixing cement in a concrete mixer; Burgos told her the shipment referred to in the October 1 call was a cement purchase; and in translating the October 7 Kirkland call, Mageno thought she was connecting one of Burgos's workers with an employer, so that the worker could follow the employer to his home for a job.

Also, according to Mageno: she did not know Burgos was dealing drugs until the events of November 17, when Burgos admitted his involvement when they realized they were being followed; the reason she was hesitant to speak to Paco later that day was because she did not know Paco well and he was her son's romantic rival, not because she feared the phone was tapped; and, as to the trip to Yakima, she was told its purpose was to visit a relative, not to deal drugs.

Testifying at Mageno's trial in her defense, Burgos said Mageno was "an innocent person," and "it wouldn't be fair for her to be judged by the crimes another person has done." He confirmed that he told Mageno they were going to Yakima to visit an ill relative, but denied that Mageno asked him questions about the phone calls she interpreted.

On cross examination, the government questioned Burgos about a prior, drug-related deportation. After he testified that he lived with Mageno for about a year in 2007 before being deported, the government asked whether Mageno knew why he was deported. Mageno's attorney objected on the ground that the answer called for speculation. After a sidebar discussion,[2] the government agreed to ask "[j]ust one question" of Burgos concerning his deportation, and the prosecutor did so, asking, "Mr. Burgos, going back to . . . 2007, the reason why you were deported was because you were trafficking in methamphetamine, isn't that right?" Burgos answered in the affirmative, and the government moved on. But Burgos never said that Mageno knew that he was deported or why, and neither did Mageno — she was never asked.

This truncated line of questioning was transformed into a centerpiece of the closing arguments. The prosecution argued that Mageno knew that Burgos had been deported for drug trafficking, and so must have known the calls she translated related to drug trafficking:

> There's one [version of events] that the big, bad government has looped Nancy

---

[2] At the sidebar, the district court incorrectly asserted, about Burgos's testimony, "He said she knew."

Mageno unfairly into this large, multi-state drug conspiracy all because she accidentally got on a couple of phone calls where she thought she was assisting in cement sales and pool cleaners and coordinating day laborers who were having clandestine meetings in parking lots of In-and-Out Burgers. That's one story.

And there's another one. There's a second story and that's that, like every individual walking the streets, she had a choice. She had a choice whether to let her godson *who she already knew had been deported for distributing methamphetamine* move in with her. She had that choice. She had a choice whether or not to get on the phone and begin translating phone calls that dealt with cut and shipments and coordinating these meetings.

She had these choices and she's the one who made the choice to get on those phones. She is the one who made the choice to help her godson, Virrio, *the one who had already been deported for distributing methamphetamine.* That is the second story line of this case. That is what this case is about. (Emphasis added.)

The prosecutor went on specifically to ask the jury to infer Mageno's knowledge of what she was translating from her supposed knowledge of Burgos's prior drug-related deportation. The prosecutor first told the jury that, "Virrio explained to you she knew because he was living with her,

then he comes back[,]" and later described Mageno's voice on the phone as the voice of a person who "already in her head knew that Virrio, the person she was translating for, has a history of distributing methamphetamine." The prosecutor concluded his closing argument on this same note: The jury should find Mageno was guilty because Mageno "knew she was translating for a known methamphetamine dealer." On rebuttal, a second prosecutor picked up the theme: "[I]n 2007, she already knows. Is it past is prologue? He's been deported because he was trafficking methamphetamine while he was living with her. He testified she knew why he was deported."

Mageno's attorney also misstated Burgos's testimony — perhaps as a result of hearing the government's argument — but not as assuredly:

> Now, [Burgos] said on the stand, and I'm not a hundred percent sure, it's either one or two things. He either said, I was deported and she knew about it, or she knew why I was deported, but the question is how would he know she knew why? Did he come up and say, hey, by the way, I've been dealing drugs, you know, and I'm gone?

In fact, Burgos had testified neither that Mageno knew he was deported nor that she knew why.

A jury convicted Mageno on the conspiracy charge, count one, but acquitted her of the other count against her, the October 7, 2010 methamphetamine distribution. The district court sentenced Mageno to 87 months in prison, followed by five years of supervised release.

## II

Mageno's central argument before us is that the government did not introduce sufficient evidence to support the jury's verdict on the conspiracy charge. The government maintains that the evidence was sufficient, and we agree.[3] But, commendably, the government raises, as a separate error, the prosecutors' repeated misstatements during closing argument that Burgos had testified to Mageno's knowledge of Burgos's deportation for dealing drugs.

Mageno did not object to the government's misstatement of Burgos's testimony at trial, did not raise this argument in her opening brief, and did not adopt it as a ground for reversal until oral argument. Should we consider the government's error under these circumstances? We conclude that we should.[4]

Generally, an issue not raised before the district court may not be considered for the first time on appeal. *See United States v. Robertson*, 52 F.3d 789, 791 (9th Cir. 1994); *see also Manta v. Chertoff*, 518 F.3d 1134, 1144 (9th Cir. 2008). But there are exceptions, of which one is where "plain error

---

[3] The sufficiency issue is addressed in a memorandum disposition filed concurrently with this opinion.

[4] In a recent case presenting a similar prosecutorial error, the government also came forward and acknowledged its error, but, unlike here, it did not do so until the en banc stage and after repeated questioning. *See United States v. Maloney*, No. 11–50311, 2014 WL 801450 (9th Cir. Feb. 28, 2014). We reversed on the basis of the government's concession, even though the issue presented to us in the opening brief was whether the appellant was denied surrebuttal argument improperly. *Id.* at *1 n.1.

has occurred and an injustice might otherwise result." *United States v. Flores-Montano*, 424 F.3d 1044, 1047 (9th Cir. 2005) (per curiam) (quoting *Robertson*, 52 F.3d at 791); *see also Gaither v. United States*, 413 F.2d 1061, 1079 (D.C. Cir. 1969) (recognizing that courts "have noticed [prosecutorial] errors where they were not objected to at trial, or even on appeal").

Federal Rule of Criminal Procedure 52(b) provides that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." As laid out in *United States v. Olano*, "Rule 52(b) review — so-called 'plain-error review' — involves four steps, or prongs": (1) "there must be an error or defect . . . that has not been . . . affirmatively waived[] by the appellant"; (2) "the legal error must be clear or obvious, rather than subject to reasonable dispute"; (3) "the error must have affected the appellant's substantial rights"; and (4) "if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error . . . if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (internal quotation marks and emphasis omitted; final alteration in original) (citing *Olano*, 507 U.S. 725, 732–36 (1993)). As will appear, we conclude that all of these requisites are met.

Mageno's failure to raise the governments' misstatements in her opening brief on appeal does not, in this unusual instance, affect our application of the plain error doctrine. Generally, an issue not raised in an opening brief will not be considered. *See e.g.*, *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009); *Stivers v. Pierce*, 71 F.3d 732, 740 n.5 (9th Cir. 1995); *United States v. Martini*, 31 F.3d 781, 782

n.2 (9th Cir. 1994) (per curiam). But that principle admits of exceptions. We consider an argument not raised in an opening brief if: (1) there is "good cause shown," or "failure to do so would result in manifest injustice"; (2) the issue is raised in the appellee's brief; or (3) failure to properly raise the issue does not prejudice the defense of the opposing party. *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (citations and internal quotation marks omitted). Here, the second and third circumstances exist and justify our reaching the issue.[5]

As to the second justification, we consider arguments not raised in the opening brief when addressed in the appellee's response; an appellee's brief that merely observes that an appellant failed to raise an issue is insufficient. *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990). The key inquiry is whether "the discussion of the issue in [the] briefs is sufficient to permit an informed resolution of the dispute and its application [to the appellant]." *Ullah*, 976 F.2d at 514.

The third consideration, lack of prejudice to the opposing party, is closely related to the second. Where the party opposing an appeal has "fully addressed the issue" in its briefing, the appellant's failure to raise the issue in an opening brief generally will "not impair the government's position on appeal," and the government will not, therefore, be prejudiced by the court's consideration of the issue. *Id.*

---

[5] Because two of the justifications for addressing an issue not raised in an opening brief apply, we do not consider whether this is a case involving "manifest injustice." *Ullah*, 976 F.2d at 514 (internal quotation marks omitted).

Here, the government raised the prosecutorial misstatements issue in its answering brief. The government's brief cited Burgos's testimony at length, and acknowledges that four government statements made in closing misstated that testimony. The government also argued that the court should not reverse in spite of this error and cited: (1) the lack of bad faith by the government; (2) the lack of a contemporaneous objection; (3) the judge's general admonition that comments by lawyers in closing are not evidence, and that the jury must decide the facts for itself; and (4) the claim's failings on plain error review. In all, the discussion of the issue spans six pages.

Given the government's ample discussion of its error, the government sufficiently addressed the issue of the prosecutors' misstatements to allow for that issue's full exploration on appeal. For the same reason, the government is not prejudiced by our consideration of the issue on appeal.[6]

In arguing to the contrary, our dissenting colleague faults us for "creat[ing]" an alleged "new exception," pursuant to which we purportedly are "considering an argument raised for the first time . . . by a member of our panel hearing argument." Dissent at 30. But the preceding analysis should make clear that our conclusion that we may reach the

---

[6] Our dissenting colleague maintains that the government was prejudiced because it "did not have the opportunity to *brief fully* the precise issue reached by the majority." Dissent at 37. This is a curious statement, because the government devotes six pages of its brief to the error and makes several merits arguments against reversal.

In addition, both parties recited the trial evidence at length for other purposes, rendering our assessment of the impact of the prosecutorial misstatements well-informed.

prosecution's misstatements despite Mageno's failure to raise the issue in her opening brief turns on the government's having canvassed the issue at length in its response, and the lack of prejudice to the government from consideration of the issue the government itself raised — *not* on the appellant's embrace of the error when questioned at argument. Accordingly, have no need to create a new exception, as it is already well-established that we may consider an issue raised for the first time by an appellee. *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1193 (9th Cir. 2006).

Considered in this light, the significance of Mageno's adoption of the issue at oral argument is that Mageno, not this court or the government, is the master of her appeal. Mageno could have purposely argued sufficiency of the evidence and no other issue for strategic reasons, because she wanted a reversal only if no retrial would occur. By checking to assure that that was not the case, we did not circumvent the precept that we usually consider only issues raised in the briefs. Again, the prosecutorial misconduct issue *was* raised in the briefing, albeit by the government.

Moreover, even if an issue is not adequately raised in the briefing, we are not precluded from addressing it. Rule 52(b) says nothing about issues reviewed for plain error having to be raised by the parties. And Rule 52(b) applies on appeal, to errors that became plain only on appeal. *Henderson v. United States*, 133 S. Ct. 1121, 1127 (2013).

Furthermore, Rule 52(b) was meant as a "restatement of existing law." Fed. R. Crim. P. 52(b) advisory committee's note (1944 adoption). The Supreme Court has long recognized — before Rule 52(b) came into existence — that "[i]n exceptional circumstances, especially in criminal cases,

appellate courts, in the public interest, may, *of their own motion*, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160 (1936) (emphasis added).

The Supreme Court has itself reversed for plain error where an issue was "not presented to the Court of Appeals and was not briefed or argued" to the Supreme Court. *Silber v. United States*, 370 U.S. 717, 717 (1962) (per curiam). To do so, the Court relied in part on the principle that "the court, at its option, may notice a plain error not presented"[7] — a principle stated in language markedly similar to the language of Rule 52(b), which the Court also cited. *Id.* at 718. Justice Kennedy has likewise noted that while "[i]n most cases . . . the party will have raised the alleged error on appeal," sometimes "a court notices an error on its own initiative under Federal Rule of Criminal Procedure 52(b)." *Olano*, 507 U.S. at 741–42 (Kennedy, J., concurring) (citing *Silber*, 370 U.S. at 718).

In short, when a government representative concedes that there was a substantial error in the trial court proceedings involving prosecutorial conduct, and we conclude that the plain error standards laid out in *Olano* are otherwise met — including that "the error seriously affects the fairness,

---

[7] *Silber* cites Revised Rules of the Supreme Court of the United States, Rule 40(1)(d)(2), 28 U.S.C., which now appears with only slight modification at Rule 24. 370 U.S. at 718. Noting that Rule 52(b) restates the existing law, the Advisory Committee Notes from the 1944 Adoption of Rule 52 in turn reference the same Revised Rule, as well as "[s]imilar provisions . . . in the rules of several circuit courts of appeals."

integrity or public reputation of judicial proceedings," 507 U.S. at 736 (internal quotation marks and alteration omitted), we may consider the error and, if otherwise appropriate, reverse the conviction.**[8]**

Counseling in favor of exercising that authority in this instance are two primary considerations: first, that the issue was raised, and briefed, by the appellee; and second, that this is not only a criminal case, *see Atkinson*, 297 U.S. at 160, but one in which a government representative's error is at issue. We conclude that despite Mageno's failure to raise the

---

**[8]** Our dissenting colleague is of course correct that circumstances such as these do not present themselves very often. But, they are not so rare as the dissent insists. *See, e.g.*, *United States v. Sum of $185,336.07 U.S. Currency*, 731 F.3d 189, 195 (2d Cir. 2013) (vacating and remanding forfeiture order even though appellant "did not raise this argument in the District Court or on appeal"); *United States v. Whitfield*, 590 F.3d 325, 347 (5th Cir. 2009) (citing *United States v. Musquiz*, 445 F.2d 963, 966 (5th Cir. 1971) (reversing a conviction for insufficient evidence on a basis not advanced in the district court or on appeal)); *United States v. Gonzalez*, 259 F.3d 355, 359 (5th Cir. 2001) (vacating sentence for plain *Apprendi* error not raised by the defendant, but raised by the government "in the interest of candor"); *United States v. Granados*, 168 F.3d 343, 346 (8th Cir. 1999) (reversing and remanding sentence although defendant "failed to raise these arguments in the district court or before this court"); *United States v. Pineda-Ortuno*, 952 F.2d 98, 105 (5th Cir. 1992) (vacating co-defendant's sentence even though he did not "raise[ ] the issue in the trial court or on appeal," and holding that "[f]airness as well as judicial economy dictate that we address now this issue that would doubtless otherwise be raised in a subsequent *habeas* proceeding"); *United States v. Murphy*, 762 F.2d 1151, 1155 (1st Cir. 1985) (reversing conviction where error not raised before trial court and not raised on appeal until oral argument); *United States v. McKinney*, 707 F.2d 381, 383 (9th Cir. 1983) (holding defendant's rights under the Confrontation Clause were violated and reversing the judgment even though "[t]he sixth amendment issue was not raised in the district court and was neither briefed nor argued in this court").

prosecutorial misstatements in her briefs as a ground for reversal, this case is one in which we may reverse for plain error if the *Olano* standards are met.**⁹**

**III**

Addressing the *Olano* factors, we conclude that all the factors are met.

*First*, for us to reverse the jury verdict in this case, there must be error that is plain. *Olano*, 507 U.S. at 732–34.

Criminal defendants have a constitutional right "not to be convicted except on the basis of evidence adduced at trial." *United States v. Schuler*, 813 F.2d 978, 980 (9th Cir. 1987). Accordingly, it has long been the rule in this circuit that prosecutors "must refrain from introducing evidence not in the record." *United States v. Artus*, 591 F.2d 526, 528 (9th Cir. 1979) (per curiam). Indeed, in light of their status and stature as representatives of the government, prosecutors have an affirmative "obligation . . . to avoid making statements of

---

**⁹** Our dissenting colleague insists that even if we may review for plain error now, we should exercise our discretion not to, because Mageno could raise the issue — actually, an ineffective assistance of counsel variant of it — in habeas corpus proceedings under 28 U.S.C. § 2255. We need not now decide whether punting an otherwise ripe issue from a direct appeal to habeas corpus review is ever justified. In this case, where the government has conceded its error, the issue is briefed, and the record complete, the greater injustice is to require a defendant to wait in prison one, two, three or more years longer to get to the same result. Nor is such a circuitous method necessarily desirable from the government's perspective, as the inevitable retrial is only pushed back further, and the difficulty of finding witnesses with fresh recollections compounded.

fact to the jury not supported by proper evidence introduced during trial." *Gaither*, 413 F.2d at 1079.

Prosecutors are free in argument to suggest that the jury make "reasonable inferences" from the evidence presented at trial. *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997). But even in circumstances where it would be reasonable for a prosecutor to argue and for the jury to make a certain inference from the evidence presented, prosecutors must not during closing argument flatly misstate testimony so as to make it appear that the permissible inference was affirmatively stated by a witness. *See United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989); *United States v. Small*, 74 F.3d 1276, 1280–82 (D.C. Cir. 1996). We have thus made plain that when a prosecutor "ma[kes] unsupported factual claims . . . . [it] is definitely improper." *United States v. Kojayan*, 8 F.3d 1315, 1321 (9th Cir. 1993).

The prosecutors' statements at the close of Mageno's trial misstated important evidence and did so repeatedly. The clearest instance of the government's error came on rebuttal, when the second prosecutor told the jury: "[Burgos] testified [Mageno] knew why he was deported." Burgos had *not* testified to this fact. Although the prosecutor asked if Mageno knew why he was deported, he never answered that question, nor did he testify that Mageno knew that he *was* deported.

The first prosecutor, in several other statements, referred to Mageno's knowledge of Burgos's criminal past. He did not ask the jury to so infer. He did not use an "introductory phrase," such as "I submit," to "alert[] the jurors that defense

counsel was not stating a fact, but asking them to use their common sense in drawing an inference." *Id.* at 1321. Instead, as the second prosecutor's later direct misstatement of Burgos's testimony would have confirmed to the jury, the earlier references sounded like, and were likely to be taken as, assertions of fact based on direct testimony.[10]

Up to this point, the government agrees. The government recognizes that the following statements made in the initial closing argument, as well as the already identified statement made in rebuttal, amount to error: "[Mageno] . . . let her godson who she already knew had been deported for distributing methamphetamine move in with her"; "[Burgos] was arrested and deported for distributing methamphetamine. This is something [Burgos] explained to you she knew because he was living with her"; and, "That's the voice on the phone that already in her head knew that the person she was translating for, has a history of distributing methamphetamine." To this list, we add one more: The government's statement that Mageno "knew she was translating for a known methamphetamine dealer."[11]

---

[10] Any inference would have been fairly weak from the actual evidence, which did not even directly establish that Mageno knew of the deportation. Mageno's knowledge of Burgos's deportation could have been inferred from her closeness to Burgos, but establishing knowledge of the *reason* for the deportation would then require an inference from an inference.

[11] Our dissenting colleague accepts, as he must, that the prosecution made *one* misstatement, but protests that the first four times the prosecution made the same point less explicitly, the statements were just requests for inferences from other facts of record. Dissent at 49. The

That the prosecutors' statements during closing argument were improper is therefore plain.

*Second*, as we are conducting plain error review, we must ask if the errors affected Mageno's "substantial rights," i.e., whether they were sufficiently prejudicial that there exists a "a reasonable probability that the error[s] affected the outcome of the trial." *Marcus*, 560 U.S. at 262. We may reverse on plain error review "only if the prosecutor[s'] improper conduct . . . tainted the verdict and deprived [Mageno] of a fair trial." *United States v. Sanchez*, 659 F.3d 1252, 1257 (9th Cir. 2011) (citation and internal quotation marks omitted)). We consider the statements in the context of the entire trial, including curative instructions given to the jury and the weight of the evidence against the defendant, to

---

government did not in its own review of the record see the statements that way. It recognized in its brief that there were several "incorrect *statements*" (emphasis added) and cited to three of the statements that our dissenting colleague insists were proper. Moreover, the dissent's view is belied by the statements themselves, which do not request that the jury infer the facts stated but recite them as having been affirmatively established. While the government could have "invite[d]," *Kojayan*, 8 F.3d at 1321, the jury to infer that Mageno knew about Burgos's deportation and provided argument concerning the facts favoring such an inference, *id.*, it did not do so.

ascertain the statements' likely effect.[12]  *Id.*; *United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005).

The comments at closing clearly misstated evidence, by explicitly and implicitly stating, five times in all, that Burgos testified that Mageno knew he was previously deported for drug trafficking.  Misstating the evidence from trial is a particularly prejudicial form of misconduct, because it distorts the information the jury is to rely on in reaching a verdict.  *Cf. Darden v. Wainwright*, 477 U.S. 168, 181–82 (1986).  By doing so, it also usurps the jury's prerogative of drawing, or not drawing, otherwise permissible inferences.

In addition, the trial judge did not admonish the jury to disregard these misstatements.  Although the judge gave the standard instructions that statements from lawyers are not evidence, and that the jury is to rely on its own recollection of the evidence at trial, these instructions were never expressly tied to the misstatements.  *See United States v. Combs*, 379 F.3d 564, 575 (9th Cir. 2004); *United States v. Kerr*, 981 F.2d 1050, 1054 (9th Cir. 1992).  "[T]he standard

---

[12] Our dissenting colleague distorts this analysis by applying the *Jackson v. Virginia* standard for reviewing the sufficiency of the evidence to an analysis of prosecutorial misstatements during closing argument. 443 U.S. 307, 326 (1979).  Our "presum[ption] . . . that the trier of fact resolved . . . conflict[ing inferences] in favor of the prosecution," Dissent at 48 (quoting *Jackson*, 443 U.S. at 326), applies in the sufficiency-of-the-evidence context, not the prejudicial error context.  When we review the effect that an error had on the outcome of a criminal jury trial, we "must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985).  In doing that, we do not presume that the jury took the view of the evidence most favorable to the government, as it may well not have done so.  *See, e.g.*, *Dixon v. Williams*, 750 F.3d 1027, 1036 (9th Cir. 2014) (per curiam).

judicial caution that the jury's recollection controls" is not a "cure-all," *Gaither*, 413 F.2d at 1079, especially where, as here, repeated misstatements of fact went uncorrected. Because Mageno's attorney did not catch the government's error, the jury likely accepted the government's characterization of the evidence as a given. And if the jury's own recollection of Burgos's testimony differed from the prosecutors' recitation, the jury likely would have speculated that the prosecutors' misstatements had at least some factual basis — that is, that the prosecutors knew the statement was so, even if there was no such testimony.[13]

Moreover, the erroneous comments featured prominently in both government closing arguments, including the last plea the members of the jury heard in the primary closing argument. An error that is "emphasized . . . during [a] trial" is more likely to influence a jury. *See* Roger J. Traynor, *The Riddle of Harmless Error* 75 (1970). Here, in his very last statement to the jury, the first prosecutor tied that erroneous fact directly to the central issue in the case, telling the jury that Mageno was guilty because she "knew she was translating for a *known* methamphetamine dealer." (Emphasis added.) The second prosecutor reiterated the erroneous statement by Burgos, this time explicitly, during rebuttal. The prominence the government afforded its description of the nonexistent testimony in its closing arguments reflects the critical role the point was meant to play in convincing the jury that Mageno knew Burgos had been involved in drug activity when she translated his calls.

---

[13] For that reason, assuring the jury that facts not in evidence support the government's case, in addition to constituting trial error, can violate a defendant's right to due process. *See Combs*, 379 F.3d at 574.

In short, this is not a situation in which the "potential prejudice of the prosecution's comments was mitigated" because "the comment did not pervade the proceedings and was not emphasized." *Hein v. Sullivan*, 601 F.3d 897, 916 (9th Cir. 2010).

The misstatement of the evidence was also important in its effect on Mageno's defense, and in its connection to the other evidence before the jury. The defense conceded that there was a conspiracy to distribute narcotics in the amount alleged by the government, putting its eggs instead in the "knowledge" basket. Mageno insisted that she was Burgos's dupe — she was used to translate purposely opaque conversations and was lied to about their content. Consistent with that defense, Mageno's counsel during closing argument characterized the central question in the case as, "What did she know[,] and when did she know it?" And again: "[D]id she know what was happening and was it her intention to further this conspiracy?" Defense counsel repeatedly argued in closing that (1) Mageno did not know that the coded conversations she translated were about drug activity; (2) that at the time she translated the conversations she believed that they "had to do with cement"; and (3) that Mageno first learned Burgos was involved in drug trafficking on November 17, when Burgos and Mageno were being followed (Mageno wanted to know why they were followed, and Burgos told her why).

To buy Mageno's explanation, the jury had to believe that Mageno would not have known or suspected her godson's involvement in the drug trade. If she knew or suspected that involvement, her insistence that she believed the discussions were about day laborers and cooking cement would be decidedly less credible. And for Mageno, who testified in her

own behalf, her credibility was critical. By misstating Burgos's testimony to include the assertion that Mageno knew of Burgos's prior drug trafficking — methamphetamine trafficking in particular — the prosecutors vastly decreased any likelihood that the jury would believe her.

The prosecutors' misstatements may have also confused defense counsel. There was no break between the government's initial closing argument and the defense argument. Defense counsel followed the government's lead in misstating Burgos's testimony, although with the caveat that he was not sure Burgos *did* say that Mageno knew the reason for the deportation. Then, feeling that he had to poke holes in the foundational basis for Burgos's non-existent testimony, defense counsel launched a weak counterattack, arguing: "[T]he question is how would he know she knew why? Did he come up [to her] and say, hey, by the way, I've been dealing drugs, you know, and I'm gone?" Defense counsel thereby challenged the credibility of its own key witness, Burgos, who had stated that Mageno was "an innocent person." To attack Burgos's credibility on the basis of something he did not say likely damaged the defense overall, by undermining Burgos's general corroboration of Mageno's version of events.[14]

---

[14] Our dissenting colleague thinks we should hold Mageno's attorney's feet to the fire for failing to object to the prosecution's misstatements and then echoing the prosecution's errors in his closing. Dissent at 56. But the dissent's contention that Mageno's attorney "introduced" the error, Dissent at 32, misconstrues the record: The government acknowledges it misstated Burgos's testimony three times before Mageno's attorney approached the lectern. And Mageno's attorney never committed himself to the most incriminating statement from the prosecution — that Mageno knew *why* Burgos was deported.

Lacking any direct evidence, the government's case against Mageno relied solely on circumstantial evidence — principally, the content of the phone calls Mageno translated and the trip to Yakima — and argued that the jury should infer that she had to know the topics discussed in the phone calls were illicit. Aside from the misstated testimony, there was no direct evidence of Mageno's knowledge of drug trading, let alone involvement in it. As her lawyer pointed out in closing: "Mageno never bought drugs, never brought drugs, never sought drugs. She never sold drugs. . . . She never even had drugs. No witness testified that she had any drugs because she didn't." That summary is accurate: The government presented no evidence that Mageno was ever in the presence of drugs. And drugs were never explicitly mentioned in the phone calls Mageno translated, not once. In a case based entirely on inference, the government's bald assertion that Burgos "testified [Mageno] knew" that he was deported for methamphetamine trafficking stands alone as powerful, direct evidence that Mageno knew about Burgos's history of involvement in the drug trade, and so must have known what was going on in the phone calls. "Is . . . the past . . . prologue?" the prosecution asked in its rebuttal argument, driving home this theme in its final presentation to the jury.

Furthermore, *had* the statement about Mageno's knowledge been made, it would almost surely have been believed. Burgos was testifying in Mageno's defense, presumably would want to help his godmother's case, and so had no motive to lie about what she knew concerning his prior drug trafficking history.

Weighing all the above factors, we conclude that the government's misstatements likely prejudiced the outcome of

Mageno's trial. The plain error substantial rights requirement was therefore met.

*Finally*, we consider whether "the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Marcus*, 560 U.S. at 262. "An error may 'seriously affect the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence"; "[c]onversely, a plain error affecting substantial rights does not, without more, satisfy [this] standard." *Olano*, 507 U.S. at 736–37. We have already observed that the likelihood that the error in this case affected the outcome is high. We further conclude that the type of error that occurred is the something "more" that satisfies the fourth prong of the plain error analysis: By repeatedly stating that a key witness gave damaging testimony that he did not in fact give, the prosecution encouraged the jury to convict Mageno on the basis of the prosecution's own statements, rather than on evidence adduced during trial. This error seriously impeded the jury's ability to function as an impartial fact-finder, thereby affecting the fairness and integrity of judicial proceedings.

The government and our dissenting colleague suggest that the fourth prong of plain error review is not met, because the prosecution did not intentionally misstate the evidence during closing argument. We reject this contention for two reasons.

First, our "warrant" to address prosecutorial error "arises from the defendant's broad right to a 'fair trial' guaranteed by the Due Process Clause[,]" *Weatherspoon*, 410 F.3d at 1152 (Trott, J., concurring in part, dissenting in part), and "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*,

455 U.S. 209, 219 (1982). Prosecutorial misstatements can constitute error "even where . . . they were apparently made in good faith." *Gaither*, 413 F.2d at 1079; *see* Bennett L. Gershman, *Mental Culpability and Prosecutorial Misconduct*, 26 Am. J. Crim. L. 121, 122–25 (1998) (observing, after surveying the case law, that courts generally apply an objective approach to claims of prosecutorial misconduct, and "do not consider a prosecutor's intent to violate a trial rule"). For example, we have held a prosecutor's invocation of personal knowledge "unquestionably improper," even while "recogniz[ing] the difficulty in identifying errors absent an objection," and even while "commend[ing] the United States Attorney" for "conced[ing] . . . the error" on appeal. *United States v. Rangel-Guzman*, 752 F.3d 1222, 1225 (9th Cir. 2014). And, as already stated, such misstatements are a type of error that where possibly determinative can affect the fairness and integrity of a jury trial, regardless of a prosecutor's subjective intent.

Second, while the misstatements here do not rise to the level of intentional misconduct, they were exceedingly reckless, and paid too short shrift to the prosecutors' "obligation" to seek a conviction only on the basis of facts in the record. *Gaither*, 413 F.2d at 1079. If the prosecutors were unsure about what Burgos actually testified to, they should have qualified their statements accordingly — especially on rebuttal, after defense counsel questioned whether Burgos did testify that Mageno knew the reason he was deported.

The prosecutor in *United States v. Carrillo*, 16 F.3d 1046, 1050 (9th Cir. 1994), for example, misstated a fact on which the defense placed much significance. But the prosecutor prefaced his misstatement by saying, "I may be wrong, and

your recollection controls, but I thought . . . ," and followed the misstatement by reminding the jury that, "[a]gain, your recollection controls." *Id.* Here, in contrast to *Carrillo*, the prosecutors chose to rely heavily on their own recollection of the testimony of a witness whom they had not themselves used in their case in chief. By doing so, they took the risk that their recollection of the evidence would prove erroneous — as it did. And then the second prosecutor exacerbated the problem by relying on the mistake in rebuttal — "He testified she knew why he was deported."

"Evidence matters; closing argument matters; statements from the prosecutor matter a great deal." *Kojayan*, 8 F.3d at 1323. Although there is no evidence that the prosecutors' misstatements were intentional, we nonetheless conclude that the error seriously affected the fairness of Mageno's trial.[15]

In sum, based on our review of the case against Mageno, we find it reasonably probable that she was convicted based on the prosecutors' false account of Burgos's testimony. We commend the government for bringing the missteps in this case to our attention. While it could be said that our decision to reverse is proof of the old adage that "no good deed goes unpunished," we do not see it that way. "[L]awyers representing the government in criminal cases serve truth and justice first." *Id.* Prosecutors have a special responsibility to provide "those accused of crime a fair trial." *Id.* (quoting

---

[15] By pointing out that the government was reckless, we do not suggest that recklessness or any other level of prosecutorial culpability is a prerequisite to a determination that the error seriously affects the fairness, integrity or public reputation of judicial proceedings, relevant though it may be. *See Marcus*, 560 U.S. at 262. However, such culpability can justify dismissal of an indictment as a sanction, a remedy we find unnecessary here. *See Kojayan*, 8 F.3d at 1325.

*Donnelly v. DeChristoforo*, 416 U.S. 637, 648–49 (1974) (Douglas J., dissenting)). By acknowledging its error on appeal, the government has performed this function admirably. But the government also created the problem, and we will, therefore, reverse Mageno's conviction so that she may have an untainted shot at maintaining her innocence without the prosecution's damaging misstatements.

**REVERSED AND REMANDED.**

WALLACE, Circuit Judge, dissenting:

I respectfully dissent. Mageno did not object to the alleged prosecutorial misstatements at trial, and did not argue that the statements prejudiced her in her appellate briefs. Mageno's appeal meets none of our exceptions for consideration of waived arguments. Instead of following our precedent and deeming the argument waived, the majority creates a new exception, considering an argument raised for the first time not by the appellant at trial, nor in appellate briefs, but by a member of our panel hearing argument. Consideration of the issue in these circumstances is inconsistent with our case law and the purposes behind our rules about preserving issues for appeal.

Not only does the majority improperly reach the prosecutorial statements despite Mageno's waiver, the majority also incorrectly concludes that the prosecutors' statements constituted plain error. Only one of the statements was improper. There was so much evidence submitted by the government at trial that Mageno would have been convicted regardless of the statements. Some of the prejudice Mageno

may have suffered was mitigated by the district court's curative instructions, and any misstatements were unintentional.

Finally, the majority's language implies that the district court judge and the government committed serious errors in Mageno's trial. In fact, it was Mageno's own attorney who committed the most troubling errors in her trial.

I.

The government admits that at one point in its closing arguments to the jury, a prosecutor erroneously stated that Nancy Mageno's godson, Jesus Guadalupe Felix Burgos, had testified that she knew he had been previously convicted and deported for a drug-related offense. In fact, Burgos had testified about his close relationship with Mageno and that he had been previously convicted and deported for that drug offense, but he had not specifically testified that Mageno knew why he had been deported. But Mageno's attorney did not object to the government's misleading statement.

In an abundance of caution, the government also asserted in its appellate brief that three other statements made in its closing argument were improper, a position with which the majority now agrees. In my view, these statements were not erroneous because Mageno's knowledge could be properly inferred from the evidence submitted to the jury about the close relationship between Burgos and Mageno. Regardless, Mageno's attorney objected to none of these allegedly misleading statements.

To recap, the government prosecutor first argued in closing statements that Mageno "had a choice whether to let

her godson who she already knew had been deported for distributing methamphetamine move in with her," and that Mageno "made the choice to help her godson, Virrio, the one who had already been deported for distributing methamphetamine." Mageno's attorney did not object that there was no *direct* evidence that Mageno knew Burgos had been deported for distributing methamphetamine.

A few minutes later, the government stated that Burgos "explained to you she knew [about his deportation] because he was living with her, then he comes back," and that Mageno "already in her head knew that [Burgos], the person she was translating for, has a history of distributing methamphetamine." Mageno's attorney did not object.

The government concluded its argument on a similar note: the jury should convict Mageno because she "knew she was translating for a known methamphetamine dealer." Mageno's attorney did not object. Thus far, in my view, the government's statements were proper, based upon the inference that Mageno knew those facts, and also knew why Burgos had been deported, on the basis of the evidence submitted to the jury regarding their relationship.

In the defense argument, Mageno's attorney stated, without "a hundred percent" confidence, that Burgos *had* in fact testified that Mageno "knew about" why he had been deported, or that "she knew why I was deported." This is when the actual error was first introduced: when Mageno's *own attorney* suggested that Burgos had testified that Mageno knew why he was deported.

On rebuttal, the government followed Mageno's attorney and stated that Mageno knew that Burgos had "been deported

because he was trafficking methamphetamine while he was living with her. He testified she knew why he was deported." Mageno's attorney did not object. While there was sufficient *indirect* evidence in the record that Mageno knew the reason for Burgos's deportation, Burgos had not testified that Mageno knew. Both the defense argument and the government's closing rebuttal arguments were in error.

Based upon the evidence at trial, including four telephone calls obtained through lawful wiretaps between Mageno and drug customers or federal agents posing as drug customers, where Mageno translated certain suspicious words on behalf of Burgos, Mageno was convicted of conspiracy to distribute a controlled substance. Mageno did not file a post-conviction motion to vacate the judgment and grant a new trial based on the government's statements during closing arguments. *See* FED. R. CRIM. P. 33. Instead, Mageno filed this appeal on a single ground: that there was insufficient evidence to support her conviction. She never raised any of the government's statements regarding her knowledge of why Burgos had been deported. In its appellate brief, the government "admirably," in the majority's words, acknowledged the prosecutors' possibly misleading statements. Majority Op. at 30. In its brief, the government argued that the statements nonetheless did not warrant reversal of Mageno's conviction, because the prosecutors had not made the statements in bad faith, Mageno was not deprived of a fair trial, the district court instructed the jury that arguments by attorneys are not evidence, and Mageno would have been convicted even if the government had not made the statements. Mageno was thus indisputably on notice of the prosecutors' statements. However, she did not submit any reply brief to adopt the statements as a basis for reversal in her appeal.

At the first part of oral argument before this court, Mageno's attorney did not affirmatively raise the argument that the government committed reversible error. More than four minutes of his allotted ten minutes passed before a member of the panel of this court asked Mageno's attorney about the government's statements. After further discussion by the judge, Mageno's attorney responded to the judge's assertion of Mageno's position by stating that the statements were "a valid argument" to support reversal. Even then, Mageno's attorney spent his subsequent time explaining why he had made the misleading statement in *his* closing argument instead of arguing that the government's statements prejudiced Mageno. Near the end of his allotted argument time, Mageno's attorney offhandedly stated "I don't believe [the government's statements were] harmless error."[1] At the very end of argument, Mageno's attorney returned to the point in passing, still not clearly arguing that Mageno had suffered any prejudice from the government's statements.

## II.

The majority errs first by even considering whether to reverse Mageno's conviction based on the government's statements. Mageno did not object to the government's statements at trial. She did not argue in either her opening or reply brief on appeal that her conviction should be reversed based on the statements. In fact, her lawyer only commented on the unraised issue when questioned about it during oral

---

[1] Mageno's lawyer was so indifferent to the argument, he did not even state the correct legal standard for our review of the government's statements. Mageno did not object to the statements at trial, so we only reverse if the government's statements constituted "plain error," rather than if the statements were "harmless error." Majority Op. at 12.

argument. When an appellant does not present an argument for review in any brief, we usually would consider that argument for reversal waived. We recognize some exceptions to that rule. But, contrary to the majority, none of the exceptions apply here, because the government did not fully brief the issues addressed in the majority's disposition. We should refuse to review the government's alleged misstatements, because Mageno has waived any argument that the statements constituted "plain error."

The majority's review of the government's statements is wrong for at least two other reasons. The majority asserts it considers the prosecutorial comments "in the context of the entire trial." Majority Op. at 21. But such review is impossible without adversarial briefing. Instead, the majority repeatedly assumes the effect of the prosecutorial statements from the cold record and its speculation about trial practice. Whatever review the majority performs, it is not review "in the context of the entire trial."

Finally, the majority considers the prosecutorial statements because Mageno's attorney did "adopt[] the issue at oral argument" before this court, so review of the statements allows Mageno to remain the "master of her appeal." Majority Op. at 15. But Mageno's attorney's indifferent responses to questions from a member of this panel do not constitute "adoption" of an argument for purposes of our review.

A.

A convicted criminal who fails to object to a prosecutorial or judicial error at trial can still seek relief on appeal if the mistake is "a plain error that affects substantial rights."

*United States v. Marcus*, 560 U.S. 258, 262 (2010), *quoting* FED. R. CRIM. P. 52(b). The "burden of establishing entitlement to relief for plain error is on the defendant claiming it, and for several reasons . . . that burden should not be too easy for defendants." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004).

Separately, when an appellant fails to argue, specifically and distinctly, an issue in his opening brief on appeal, we usually hold that the appellant has waived his right of appellate review of that issue, even in criminal cases. *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1126 (9th Cir. 2005).

Mageno did not object to any of the government's statements at trial, and did not argue that the statements merited reversal of her conviction in her opening or reply briefs on appeal. The government repeatedly argued that because "Mageno has not argued that the prosecutors' statements warrant reversal," she "has therefore forfeited such a claim." Thus, under our normal practice, we would not consider the statements in this appeal.

B.

I recognize that our court sometimes considers arguments not raised in an opening brief. Our precedent makes clear that the circumstances are limited to three well-established exceptions. "First, we will review an issue not present in an opening brief for good cause shown, or if a failure to do so would result in manifest injustice. Second, we have discretion to review an issue not raised by appellant when it is raised in the appellee's brief. Third, we may review an issue if the failure to raise the issue properly did not prejudice the

defense of the opposing party." *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (citations and internal quotation marks omitted). Contrary to the majority's conclusion, *none* of the exceptions apply here. Further, consideration of an issue so thoroughly waived is inconsistent with the purposes of our rules about preserving issues for appeal.

1.

The majority asserts that we may consider the prosecutorial statements because the government addressed the statements in its appellate brief, and thus is not prejudiced, so both the "second and third circumstances [from *Ullah*] exist [to] justify our reaching the issue." Majority Op. at 13. While the government did notify us of its possibly misleading statements in the closing argument, the government did not have the opportunity to *brief fully* two of the issues reached by the majority, and thus is prejudiced by the majority's reversal on that basis.

The government has never had the opportunity to rebut the legal sources the majority now offers to reverse Mageno's conviction. Majority Op. at 18–30. Had Mageno adopted the argument in her optional reply brief, as the government likely assumed, the government would have then had the opportunity to file a supplemental brief or respond to her analysis in oral argument. But Mageno did not file *any* reply brief. Because of that failure, the government never had the opportunity to explain (as I do later) the incorrect reasoning used to reverse Mageno's conviction.

Second, the government has never had the opportunity to rebut the majority's nearly unprecedented relief of reversing

a conviction based on an error in these factual circumstances, when not objected to at trial or raised in either an opening or reply brief. The majority cites to no binding authority from the past *thirty years* where this court or the Supreme Court has reversed a conviction when a defendant did not object to an alleged government error at trial, did not raise the alleged error in her opening brief, and did not raise or even refer to the alleged error in her optional reply brief. Even in *United States v. Atkinson*, 297 U.S. 157 (1936), where the Supreme Court first recognized that "[i]n exceptional circumstances, especially in criminal cases, appellate courts . . . may, of their own motion, notice errors to which no exception has been taken," the Court held that "no such case is presented here," and affirmed the conviction because "the error assigned was not made the subject of appropriate exception or request to charge upon the trial." *Id.* at 160.

If Mageno had raised the argument in her reply brief, the government could have prepared to argue specifically about the statements at oral argument. But Mageno never did so. The government thus has not had the opportunity to explain why this case does not implicate the drastic remedy offered by the Supreme Court in *Silber v. United States*, 370 U.S. 717 (1962) (per curiam).[2] The majority's reversal in this posture

---

[2] The majority engages in a serious and impressive analysis of our theoretical power to correct plain errors not presented to us. Majority Op. at 15–18. But that power is discretionary. *United States v. Jeffery*, 473 F.2d 268, 270 n.2 (9th Cir. 1973). Using that discretion, we have cabined our authority to review unraised plain errors under *Silber* and Rule 52(b) to the three circumstances described in *Ullah*. *See United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005) (holding that "we will not apply an exception [besides the three from *Ullah*] on our own accord").

thus prejudices the government. Contrary to the majority, neither the second nor third exceptions from *Ullah* apply here.

2.

We also consider an argument not raised in an opening brief when there is "good cause shown" or "failure to do so would result in manifest injustice." *Ullah*, 976 F.2d at 514. Mageno has not shown good cause for her failure to raise the prosecutorial misstatements in her opening brief. In fact, she has shown absolutely nothing because she failed to file any reply brief, and there is nothing in the record to show she was unable to raise the issue, at the latest, in a reply brief. *See, e.g.*, *Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1150 n.3 (9th Cir. 2007) (considering an argument not

---

The majority recognizes that "circumstances such as these do not present themselves very often." Majority Op. at 17 n.8. The majority then suggests that such circumstances do arise in other circuits with some frequency. But those far-flung results do not trump our decisions in *Kama* and *Ullah*.

The only decision of ours that the majority cites, *United States v. McKinney*, 707 F.2d 381 (9th Cir. 1983), is at odds not only with *Kama* but also with Rule 52(b) itself, because there we incorrectly reviewed whether the Confrontation Clause violation not objected to at trial was "harmless beyond a reasonable doubt," *id.* at 384–85, rather than under the correct standard of whether the alleged error was "plain." *See Silber*, 370 U.S. at 718; *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013) (subjecting alleged violations of the Confrontation Clause not objected to at trial to plain error review); *McKinney*, 707 F.2d at 385 (Belloni, J., dissenting) (recognizing that the majority applied the incorrect legal standard). Thus, our application of the waiver rules in *McKinney* was wrongly decided at the time and is also inconsistent with our later precedent.

raised in an opening brief because appellants explained in their reply brief why they had not done so).

Nor would Mageno suffer a manifest injustice if we did not consider the prosecutorial statements. If Mageno did suffer any prejudice from the government's statements, she could still have her conviction vacated, despite her waiver before this court, by filing a habeas petition based on ineffective assistance of counsel. She could then properly raise for judicial review the government's statements and her attorney's failure to object to, or brief, those statements. This is the approach taken by some of our sister circuits. *United States v. Evans*, 131 F.3d 1192, 1193 (7th Cir. 1997) (refusing to address an issue raised by defendant for the first time in a reply brief, because the defendant "may present this contention under 28 U.S.C. § 2255"); *see also United States v. Jernigan*, 341 F.3d 1273, 1290–92 (11th Cir. 2003) (Fullam, J., concurring) (appellants cannot be afforded relief on direct appeal "but must await collateral attack via a § 2255 motion" because they did not object to the error at trial or raise the issue on appeal even though "neither appellant received a fundamentally fair trial").

Requiring Mageno to raise the ineffectiveness of her counsel in a collateral proceeding is particularly necessary here, because Mageno *still employs the same counsel who acted deficiently at trial and on appeal*. I have found no case where a court has held counsel to be ineffective when the lawyer still represents the defendant. Mageno's attorney is still acting as her agent, so she is responsible for any negligent acts he may have committed. *Coleman v. Thompson*, 501 U.S. 722, 753–54 (1991); *accord Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998) (viewing

"counsel's pronouncements regarding his [own ineffective] performance with extreme skepticism").

Because the majority wrongly concludes that the second and third *Ullah* exceptions apply, it "do[es] not consider whether this is a case involving 'manifest injustice.'" Majority Op. at 13 n.5. Regardless, it criticizes my view that Mageno should raise the government's statements in a collateral proceeding after firing her attorney because this would be a "greater injustice," and states that "[w]e need not now decide whether punting an otherwise ripe issue from a direct appeal to habeas corpus review is ever justified." *Id.* at 18 n.9. But that argument misses the point. As I explain above, the ineffective-assistance issue is *not ripe*, because Mageno has not fired her attorney or raised the issue, and the record about Mageno's attorney's strategic decisionmaking (or lack thereof) is not complete. While the majority suggests it would be an injustice to require Mageno "to wait in prison one, two, three or more years longer to get to the same result" of release from prison, that is precisely what the Supreme Court requires: even when a defendant has a meritorious claim for ineffective assistance, the defendant often must wait, in prison, to file a collateral attack instead of having a court decide the issue on direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003) ("in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance").

3.

I understand that our rules about preserving issues can sometimes seem academic and formalistic, rather than practical. As a result, we often see serious disagreements regarding whether to apply the rules in face of an alleged

"manifest injustice." *See, e.g.*, *Ward v. Chavez*, 678 F.3d 1042, 1052 n.6 (9th Cir. 2012); *id.* at 1053–54 (Wallace, J., dissenting); *Hall v. City of Los Angeles*, 697 F.3d 1059, 1070–72 (9th Cir. 2012); *id.* at 1077–78 (Ikuta, J., dissenting).

There are indeed important "formal" reasons for holding that a party waives an issue if he fails specifically and distinctly to provide argument about the issue at trial or in appellate briefs. Because judges "are not like pigs, hunting for truffles buried in briefs," we require parties to preserve valid issues to assist our review. *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994), *citing United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). As a general matter, we have an adversarial court system, where "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Nat'l Aeronautics & Space Admin. v. Nelson*, 131 S. Ct. 746, 756 n.10 (2011); *Knox v. Serv. Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2298 (2012) (Sotomayor, J., concurring in the judgment); *see also* Diarmuid F. O'Scannlain, *The Role of the Federal Judge Under the Constitution: Some Perspectives from the Ninth Circuit*, 33 HARV. J.L. & PUB. POL'Y 963, 975–78 (2010). We should also encourage parties to raise issues before district judges, who have greater competence to find facts, which allows us to rule on a complete record. Joan E. Steinman, *Appellate Courts as First Responders: The Constitutionality and Propriety of Appellate Courts' Resolving Issues in the First Instance*, 87 NOTRE DAME L. REV. 1521, 1602–04 (2012). Further, we do not have the resources to be able to examine minutely every trial record without assistance from the litigants to determine if a defendant's constitutional rights

have been violated. Sarah M. R. Cravens, *Involved Appellate Judging*, 88 MARQ. L. REV. 251, 272–73 (2004).

Regardless of our personal views on our law about waiver, we, as a three-judge panel, have no power to create a new exception beyond the three from *Ullah. See Kama*, 394 F.3d at 1238 ("we will not apply an exception [besides the three from *Ullah*] on our own accord"). We are bound by a prior decision about a procedural rule like appellate waiver no less than a decision about a substantive rule. *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc). Because this case does not meet any of the exceptions from *Ullah*, we should not consider the prosecutorial statements at all.

C.

The majority's decision to consider the prosecutorial statements is not only inconsistent with our case law and the formal bases for our waiver rules. There are also important practical reasons for our rules, which are well-illustrated by this appeal.

As the majority describes, we can only reverse Mageno's conviction if the government's alleged misstatements "affected Mageno's 'substantial rights'" in that "they were sufficiently prejudicial." Majority Op. at 21. The majority carefully reviews the record to determine the prejudice Mageno may have suffered. But it may have missed a statement by the government or the district court judge that further mitigated any prejudice that Mageno suffered from the comments. The majority may have incorrectly assessed the extent of the evidence submitted to the jury against Mageno. Because Mageno failed to raise the issue in opening or reply brief, the government has not been afforded the

opportunity to submit reference to evidence or argument regarding the tone or inflection used by the prosecutors when making the statements, considerations which we recognize are important in reviewing whether an attorney argument is improper. *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1114–15 (9th Cir. 2005). All the majority has is the cold record and six pages of the government's appellate brief as its basis for deciding to reverse Mageno's conviction.

Indeed, as the majority correctly states, we must consider the government's statements "in the context of the entire trial." Majority Op. at 21. But there is no way to examine the context of this trial without adversarial briefing. Instead, the majority cites to generalities from other cases and its own speculation and understanding of trial practice: "[m]isstating the evidence from trial is a particularly prejudicial form of misconduct," *id.* at 22; "the jury likely accepted the government's characterization" and "likely would have speculated that the prosecutors' misstatements had at least some factual basis," *id.* at 23; "[a]n error that is 'emphasized . . . during [a] trial' is more likely to influence a jury," *id.* (citations omitted); "[t]he prominence the government afforded . . . reflects the critical role the point was meant to play in convincing the jury that Mageno knew Burgos had been involved in drug activity," *id.*; "[t]he prosecutors' misstatements may have also confused defense counsel," and that the defense attorney "fe[lt] that he had to poke holes in the foundational basis for Burgos's non-existent testimony," *id.* at 25; Mageno's attorney's statement "likely damaged the defense overall," *id.*; and "*had* the statement about Mageno's knowledge been made, it would almost surely have been believed," *id.* at 26. These are generalizations, speculations, and assumptions about the jury's response, the government's intent, and Mageno's attorney's actions. They are not

grounded in the record, and are not necessarily true of the actual trial we are reviewing.

If we refused to review the statements, Mageno could file a habeas petition based on ineffective assistance of counsel. That would allow her to provide specific record evidence about the actual trial we are reviewing. But the majority's premature consideration fails to review the comments in the context of the entire trial.

### D.

Finally, the majority suggests that its review honors the principle that Mageno is the "master of her appeal," and that it only reviews the comments because Mageno's attorney adopted the issue at oral argument. Majority Op. at 15.

But Mageno's attorney did *not* adopt the argument. He merely agreed with a member of this court that it was "a valid argument." He never made a coherent argument for why we should reverse, instead misstating the legal standard for our review. His passing responses do not constitute adoption of an argument. *See Laboa v. Calderon*, 224 F.3d 972, 980 n.6 (9th Cir. 2000) (refusing to consider an argument suggested by a habeas petitioner when stated with "cryptic" and "passing" references, because "we [do not] see how wholly crafting an argument on [the petitioner's] behalf could be anything but prejudicial to the Warden"); *accord Swipies v. Kofka*, 419 F.3d 709, 717 (8th Cir. 2005) (refusing to review an argument when the habeas petitioner did not object at trial or raise the argument in his appellate briefs, in light of his "inaction" and "relative indifference" to the argument).

## E.

Under our usual rules requiring an appellant to raise an issue in its briefs, Mageno has waived review of the government's allegedly improper statements. This appeal does not meet any of the exceptions we have recognized to overcome such a waiver. Instead, the majority makes up a new exception out of whole cloth, at odds with the nature of the American adversarial system and inappropriate in this posture. There is no basis for the majority's misguided consideration of the government's alleged misstatements in Mageno's trial. When a judge asks a question or makes a statement that, as the record proves here, was not adopted by defense counsel, the statement or question is not the *appellant's issue* on appeal.

## III.

Even if we were to consider the government's statements, the majority errs in reversing Mageno's conviction. Mageno did not object to the statements, so we review for plain error. We should only reverse if "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Marcus*, 560 U.S. at 262 (citations and alterations omitted).

No plain error exists here. The jury could have inferred from the indirect evidence that Mageno knew why Burgos had been deported, which means that the government made only one misstatement. Even if we accept that all of the

prosecutors' statements at issue were erroneous, there is still no basis to reverse the conviction because the statements did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The evidence against Mageno was so strong that the jury would have reached the same verdict without the statements, some of the prejudice she suffered was mitigated by the district court's curative jury instructions, and any misstatements were inadvertent.

A.

In his testimony, Burgos stated that he had been living with Mageno in 2007, and that he was deported because he was trafficking methamphetamine. After he returned to the United States in March 2010, he moved back in with Mageno. Because of an objection, Burgos never answered the government's flat question of whether Mageno knew why Burgos was deported.

In rebuttal argument, a prosecutor stated that Burgos "testified she knew why he was deported." This statement was incorrect. But the other statements made by the government in closing argument are not clearly false. Burgos testified that he had been living with Mageno (his godmother), was deported for drug trafficking, and then moved back in with her. The jury could infer both that Mageno knew Burgos had been deported and why he had been deported. Prosecutors are free to argue reasonable inferences from the record. *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989). Each of the other supposed misstatements the government made in closing was based on the reasonable inference that Mageno knew why Burgos had been deported, insofar as Mageno and Burgos were close and

Burgos left Mageno's house for three years and then, mysteriously, returned.

Contrary to the majority, we do not review whether that inference was "fairly weak," Majority Op. at 20 n.10, or even whether the government "request[ed] that the jury infer the facts stated." *Id.* at 21 n.11, *citing United States v. Kojayan*, 8 F.3d 1315, 1321 (9th Cir. 1993) (holding the government did not commit misconduct when it "invite[d] the jury to infer things from the evidence," but not holding the inverse, that a failure to invite the jury to reach a reasonable inference would necessarily be improper). Instead, we review only whether the inference was "reasonable." *Gray*, 876 F.2d at 1411; *see also United States v. Small*, 74 F.3d 1276, 1281, 1284 (D.C. Cir. 1996) (in an out-of-circuit case cited by the majority, the court held that a statement was an unreasonable inference from the evidence because there was "no evidence" to support the statement, but nonetheless affirmed the conviction). Here, the inference was reasonable because there was indeed some evidence to support the inference that Mageno knew why Burgos had been deported. Additionally, when we review a conviction on appeal we "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflict[ing inferences] in favor of the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 326 (1979).**[3]**

---

**[3]** The majority disputes the relevance of *Jackson*. Majority Op. at 22 n.12. But it is actually the majority's citation to *Dixon v. Williams*, 750 F.3d 1027 (9th Cir. 2014) that is irrelevant. Here, Mageno had not submitted "considerable evidence" that she did not know why Burgos was deported. *Id.* at 1036. The only evidence submitted was that Mageno and Burgos were close, which supports the reasonable inference that Mageno knew why Burgos was deported. In such a case, we should presume that

At most, then, I believe the government made *one*, rather than *five*, erroneous statements in closing arguments: namely, that Burgos had testified that Mageno knew why her godson was deported.[4]

B.

But even if I agreed that all of the government's statements were based on unreasonable inferences from the evidence and thus erroneous, there was sufficient evidence at trial that it is improbable the jury would have reached a different verdict if the government had not made them. Majority Op. at 3, 11 (agreeing with the government that the evidence was sufficient to support the jury's verdict); *United States v. Christophe*, 833 F.2d 1296, 1301 (9th Cir. 1987) (reversal of conviction based on prosecutorial misstatements only justified when "it is more probable than not that the misconduct materially affected the verdict").

Jurors heard four telephone calls from lawfully obtained wiretaps between Mageno and drug customers or federal agents posing as drug customers. In those calls, Mageno

---

the jury followed that reasonable inference. Also, *Dixon* was decided under the "harmless," rather than "plain," error standard. *Id.* at 1034–36.

[4] The government, in an abundance of caution, suggested in its brief that three of the other statements were improper. But the government also argued that "[t]he jury could have reasonably found that [Mageno] would have likely known the circumstances that surrounded [Burgos's] deportation," which would mean that only one of the statements was erroneous. *See Gray*, 876 F.2d at 1417. The majority latches on to the government's suggestion that the three additional statements were improper, but fails to analyze the government's later, and correct, argument that those three statements were proper. Majority Op. at 21 n.11.

translated conversations for Burgos. A law enforcement agent testified that the conversations included code words for narcotics and narcotics sales.

After Mageno confronted an undercover agent who was following her, and Burgos told her that he was involved in drug activities, she refused to mention Burgos's location to a caller "over the phone," because "things are also happening here." An agent with knowledge of this conversation testified at trial that Mageno intended for the caller to call Burgos on a different number in case a law enforcement offer was listening. After Mageno indisputably knew of Burgos's drug activities, she traveled with him to Yakima, Washington.

This evidence shows that regardless of whether the prosecutors had made the statements, the jury would still have convicted Mageno. Although "there was no direct evidence of Mageno's knowledge of drug trading," Majority Op. at 26, the testimony at trial demonstrated that Mageno continued to interact with Burgos at least twice after she indisputably knew that he was dealing drugs, when she was evasive towards the telephone caller, and on the trip to Yakima. Her continued interaction with Burgos after she certainly knew he was involved in narcotics provides strong circumstantial evidence that she knew of his involvement all along.

C.

Even if the government's statements were in error, most of the prejudice Mageno may have suffered was mitigated by the district court's jury instructions. First, before opening statements, the judge stated that "the questions of the lawyers and their arguments are not evidence. What the witnesses say is evidence. . . so it's the statements of the witnesses, the

testimony of the witnesses, that's important." During jury instructions, before closing arguments, the district court instructed the jury that:

> In reaching your verdict, you may consider only the testimony and exhibits received in evidence. The following things are not evidence and you may not consider them in deciding what the facts are: Number one, questions, statements, objections, and arguments by the - - let me start that again. Number one, questions, statements, objections, and arguments by the lawyers are not evidence. The lawyers are not witnesses. Although you may consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence. Similarly, what the lawyers have said in their opening statements, what they will say at their closing arguments, and at other times, is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

Finally, the judge repeated one more time: "The arguments and statements of the attorneys are not evidence. If you remember the facts differently from the way the attorneys have stated them, you should base your decision on what you remember."

Because juries are presumed to follow instructions given to them, the district judge's curative statements mitigated the

prejudice Mageno may have suffered from the misstatements. *See United States v. Bracy*, 67 F.3d 1421, 1431 (9th Cir. 1995) (even if the prosecutorial statement was improper, the district court's caution to the jury that "'[q]uestions, objections, statements, and arguments of counsel are not evidence in the case.' . . . neutralized any prejudicial effect the prosecutor's statement may have had").

The majority tries to distinguish this rule by arguing that "general" rather than "specific" instructions do not mitigate the prejudice caused by prosecutorial misstatements of fact. Majority Op. at 22. But the majority can only do so by overreading our decisions. Though we have suggested that general jury instructions do not always fully "neutralize" the harm of an improper prosecutorial comment, *United States v. Kerr*, 981 F.2d 1050, 1054 (9th Cir. 1992), *United States v. Combs*, 379 F.3d 564, 575 (9th Cir. 2004), we have never held that general instructions are wholly irrelevant to our determination of prejudice, and in fact have held precisely the opposite. *Hein v. Sullivan*, 601 F.3d 897, 914–16 (9th Cir. 2010) ("much of the potential prejudice of the prosecution's comments was mitigated. The trial court sustained a number of objections and gave timely cautionary instructions to the jury, including general instructions about the hortative nature of summation"); *Bracy*, 67 F.3d at 1431–32. Where, as here, the district judge thrice reminded the jury that only the evidence could be considered in reaching its verdict, our case law recognizes mitigation of the prejudice Mageno may have suffered from the improper statements.

## D.

Lastly, there is no evidence in the record that the government's misstatements were intentional. Though the

"touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor," *Smith v. Phillips*, 455 U.S. 209, 219 (1982), we have repeatedly recognized that "[a]nyone can make a mistake," so to "determin[e] the proper remedy" for prosecutorial misstatements, "we must consider the government's willfulness in committing the misconduct and its willingness to own up to it." *Kojayan*, 8 F.3d at 1318. Here, the government has been willing to own up to its arguable misconduct, pointing out the questionable statements to us and to Mageno in its appellate brief despite Mageno's complete failure to object at trial or raise the issue in her appellate briefs. This willingness, on the part of the government, to own up to its possible errors provides yet another reason that the statements did not affect Mageno's substantial rights, meriting reversal of conviction.

Once more, the majority offers little in the face of our cases recognizing the importance of prosecutorial intent. Majority Op. at 27–28. From our law, the majority cites only our decision in *United States v. Rangel-Guzman*, 752 F.3d 1222, 1226 (9th Cir. 2014), where we *affirmed* the appellant's conviction because "there's no reason to believe the jury would have accepted the version of events posited by [the appellant] . . . at trial—even absent the prosecutor's erroneous [statement]—[the appellant] has failed to demonstrate that the prosecutorial error in this case affected his substantial rights." As I have stated, there is no reason to believe the jury would have accepted Mageno's story that she did not know of the conspiracy given her close relationship with Burgos, and her continued association with him even after she indisputably knew he was dealing narcotics. The majority also cites a law review article that observes that courts "generally" apply an objective, rather than intent-based, approach to prosecutorial

misconduct. Bennett L. Gershman, *Mental Culpability and Prosecutorial Misconduct*, 26 AM. J. CRIM. L. 121 (1998). Not only is a fifteen-year-old academic survey of out-of-circuit case law and general perceptions of that law not binding upon us, the article actually concluded that there are several instances when a prosecutor's mental state should be relevant and suggests that "[c]ourts . . . explicitly identify a prosecutor's mental culpability in determining whether the conduct was improper." *Id.* at 164.

The majority implies that prosecutorial intent matters only when the government qualifies the misstatements. Majority Op. at 28–29, *citing United States v. Carrillo*, 16 F.3d 1046, 1050 (9th Cir. 1994). But we have not recognized such a distinction. *See, e.g.*, *Jeffries v. Blodgett*, 5 F.3d 1180, 1193 (9th Cir. 1993) ("[w]e do not believe that the [error] rendered Jeffries' trial fundamentally unfair. First, the statement was inadvertent and not a prosecutorial attempt to elicit otherwise inadmissible evidence"); *Gage v. United States*, 167 F.2d 122, 125–26 (9th Cir. 1948) ("[i]nsofar as any inaccuracy existed in the prosecutor's statement to the jury, it appears to have been unintentional," which supported our conclusion that the "alleged error is not such as could have so seriously prejudiced the rights of appellant as to require us to take notice of it in the absence of objection or assignment of error").

As most of the government's statements were based on reasonable inferences from Burgos's testimony and the record, they were not erroneous. *Gray*, 876 F.2d at 1417. Mageno faced so much evidence in her trial that there is no "reasonable probability" that absent any government misstatements she would have been acquitted. *Hein*, 601 F.3d at 914. The district court repeatedly admonished the jury that

the statements of the lawyers were not evidence, which further mitigated any prejudice Mageno may have suffered. *Bracy*, 67 F.3d at 1431. The record shows that the government made any misstatements inadvertently, and when it realized the errors, brought them to our attention. *Kojayan*, 8 F.3d at 1318. Thus, even if Mageno had not waived review of the prosecutorial statements, the statements did not affect the outcome of her trial and did not seriously affect the fairness of judicial proceedings, so there was no plain error and we should not reverse her conviction.

## IV.

Finally, I disagree with the implications of the language the majority uses. The majority states that the "prosecutors' statements during closing argument were improper," Majority Op. at 21, implies that the prosecutors failed to "serve truth and justice first," *id.* at 29, and states that it was the prosecutors who "created the problem" here. *Id.* at 30.[5] The majority also implicitly condemns the district court for not "expressly t[ying]" the instructions to the prosecutors' misstatements. *Id.* at 22. But the truly negligent actor in Mageno's trial, her attorney, is mentioned only in passing.

---

[5] The majority compares this appeal to our "recent case presenting a similar prosecutorial error [where] the government also came forward and acknowledged its error, but, unlike here, it did not do so until the en banc stage and after repeated questioning." Majority Op. at 11 n.4, *discussing United States v. Maloney*, No. 11–50311, 2014 WL 801450 (9th Cir. Feb. 28, 2014) (en banc). The comparison is irrelevant and highly misleading: that case involved intentional and far more troubling prosecutorial misconduct by the government, by a different United States Attorneys' Office, and the Assistant United States Attorneys in this case brought the potentially erroneous statements to our attention in their answering brief, not after questioning by the panel.

Although the majority does not explicitly point out Mageno's attorney's deficient performance, his errors are obvious even from the majority's description of the record. Mageno's defense "put[] its eggs . . . in the 'knowledge' basket." *Id.* at 24. Despite this theory of the case, her attorney failed to object when the government suggested and then unambiguously stated that Mageno knew why Burgos had been deported, which eviscerated the supposed defense strategy. *Id.* at 10. After he failed to object, he still maintained focus on Mageno's knowledge in closing argument. *Id.* at 24. Shockingly, he then himself misstated Burgos's testimony and, according to the majority, dramatically undermined his own theory of the case. *Id.* at 25. The majority assumes, without any record citation, that the government's statements made him "launch[] a weak counterattack," and "damaged the defense overall." *Id.* Then he failed to object when the government clearly misstated the evidence by arguing that Burgos testified that Mageno knew why he had been deported. *Id.* at 26 (which is accurate in only one of the five statements).

What the majority overlooks in its description of the trial is that Mageno's attorney never objected to the government's allegedly harmful statements, and he did not file a motion for a new trial. He did not appeal to this court on the basis of the government's statements. Even after the government raised the potentially erroneous statements in its answering brief, he did not file a reply brief, as he was entitled to, to adopt the argument pointed out by the government. Finally, he did not raise these prosecutors' statements at oral argument before this court. Only when a judge of this panel brought up the statements did Mageno's attorney state that the judge raised a good argument. He did not adopt or specifically enunciate the legal argument.

The majority reminds us that "[p]rosecutors have a special responsibility to provide 'those accused of crime a fair trial.'" Majority Op. at 29, *quoting Kojayan*, 8 F.3d at 1323. But "[t]he government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence." *Strickland v. Washington*, 466 U.S. 668, 693 (1984).[6]

V.

The majority is simply wrong. We should not review the government's statements from the closing arguments. Even if we did, we should only review one statement: that Burgos testified that Mageno knew he was deported because of his involvement in drug activity. The other statements about Mageno's knowledge were fair inferences from the record. Moreover, even if all of the statements were improper, we

---

[6] The majority and I have a factual disagreement over whether Mageno's attorney "introduced" the error, based on our disagreement about whether the government's first three statements were improper. Majority Op. at 25 n.14. But the majority does not, and cannot, question the other serious errors performed by Mageno's counsel independent of his own erroneous statements, including his failure to object to the government's statements, his failure to file a motion for a new trial, his failure to appeal the statements to this court, his failure to file a reply brief, and his failure to prepare to discuss the statements at oral argument.

Regardless of Mageno's counsel's performance, I would not reverse Mageno's conviction, because "the result of the proceeding would [not] have been different" in the absence of his errors. *Strickland*, 466 U.S. at 694. Mageno did not suffer sufficient prejudice that we could determine she would have been acquitted absent the prosecutorial statements, and thus did not suffer prejudice from her counsel's deficient performance. It is the majority that should agree with me, by "hold[ing] Mageno's attorney's feet to the fire," given its own recitation of the litany of his errors and its conclusion that Mageno was prejudiced.

still should not reverse because the result of the trial would have been the same without the statements. "Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it." Roger J. Traynor, *The Riddle of Harmless Error* 50 (1970). Additionally, I am concerned that the negligent actor most responsible for any mistakes at trial, Mageno's own attorney, goes unnamed in the majority's opinion.

On the actual basis of Mageno's appeal, her argument that there was insufficient evidence of her involvement in the conspiracy, we should affirm, because a reasonable jury could conclude that Mageno knew that Burgos was dealing drugs and that her conduct facilitated that conspiracy. *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).

I dissent.