**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| FREDERIC K. DIXON,<br>*Petitioner-Appellant*,<br><br>v.<br><br>BRIAN E. WILLIAMS, SR.; ATTORNEY GENERAL OF THE STATE OF NEVADA,<br>*Respondents-Appellees*. | No. 10-17145<br><br>D.C. No.<br>2:09-cv-00066-PMP-PAL<br><br>ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, Senior District Judge, Presiding

Argued and Submitted
March 10, 2014—San Francisco, California

Filed April 30, 2014
Amended June 11, 2014

Before: John T. Noonan, Sidney R. Thomas,
and Marsha S. Berzon, Circuit Judges.

Per Curiam Opinion

## SUMMARY[*]

### Habeas Corpus

The panel reversed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a jury instruction on self-defense.

The trial court gave an inaccurate jury instruction that an honest but "reasonable" (instead of "unreasonable") belief in the necessity for self-defense does not negate malice and does not reduce the offense from murder to manslaughter. The panel held that this error was not harmless, because the error reduced the State's burden for convicting petitioner of murder instead of voluntary manslaughter, and improperly limited the jury's consideration of the kind of provocation that could give rise to manslaughter, even if the other elements of manslaughter were established.

### COUNSEL

Randolph Fiedler (argued) and Debra A. Bookout, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender, Las Vegas, Nevada, for Petitioner-Appellant.

Michael J. Bongard (argued), Deputy Attorney General; Catherine Cortez Masto, Nevada Attorney General, Ely, Nevada, for Respondent-Appellee.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## ORDER

The Slip Opinion filed on April 30, 2014 is amended as follows:

The last sentence of the first full paragraph on page 11 is deleted and replaced with the following sentence:

> But this "reasonable likelihood" inquiry does not apply when the disputed instruction is erroneous rather than ambiguous. *See Boyde*, 494 U.S. at 380 (distinguishing situations when the test would apply from those where the instruction at issue was "concededly erroneous [or] found so by a court"); *see also Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003).

With this amendment, the panel has unanimously voted to deny the petition for rehearing. Judge Thomas and Judge Berzon have voted to deny the petition for rehearing en banc, and Judge Noonan so recommends.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing is **DENIED** and the suggestion for rehearing en banc is **REJECTED**.

No future petitions for rehearing or rehearing en banc will be entertained.

**OPINION**

PER CURIAM:

Petitioner Frederic K. Dixon seeks federal habeas relief on the basis that the state trial court improperly instructed the jury on self-defense in violation of his Fourteenth Amendment right to due process. We agree and reverse the district court's denial of habeas relief.

I

Dixon was charged in the district court of Clark County, Nevada with murder with a deadly weapon for the shooting death of Derrick Nunley on November 14, 2003.

The parties do not dispute most of the facts related to the shooting, including the following: Early in the morning on the day of the shooting, Dixon went to Club 7, a night club in Las Vegas, with his two younger brothers, Gabriel and Marcus Anderson. When Dixon's girlfriend tried to leave, Troy Nunley (also known as Fly) and his friends were standing next to her vehicle in the parking lot. The Nunley group was asked to move to allow her to leave. They refused, and she hit Nunley in the arm as she backed up her car. Nunley became upset, kicked the woman's car, and screamed obscenities at her. When Dixon came out of the club, Nunley began yelling at him as well, and, at some point, removed a box cutter from his pocket. One of the club's security officers grabbed Nunley's arm to prevent him from using the box cutter.

Dixon and his brothers left the club's parking lot, and drove to the Palms Hotel and Casino. They were followed by

a group of Nunley's friends, who made threatening gestures through the windows of their vehicles. After Dixon and his brothers reached the parking lot of the Palms, Nunley's friends arrived. Due to the loud commotion, the Palms security personnel did not allow the groups to enter the casino. In the parking lot, a fist fight began between Nunley's group and Dixon's group. Someone in Nunley's group began throwing rocks at Dixon and his brothers. Nunley pulled out the box cutter again, and brandished it at Dixon, repeatedly threatening that "I'm going to cut your face off," and that he would kill Dixon.

At some point, Nunley returned to his car and entered it from the passenger side, without closing the door. Dixon returned to his vehicle, got a gun, ran to Nunley's car, and shot him four times. Nunley died at the scene.

At trial, Dixon did not deny shooting Nunley. Instead, he argued that he shot Nunley in self-defense. Jury Instruction 19, which set forth the basic parameters of self-defense, contained an error. The instruction stated in full:

> The killing of another person in self-defense is justified and not unlawful when the person who does the killing actually and reasonably believes:
>
> > 1. That there is imminent danger that the assailant will either kill him or cause him great bodily injury; and
> >
> > 2. That it is absolutely necessary under the circumstances for him to use in self-defense force or means that might cause

the death of the other person, for the purpose of avoiding death or great bodily injury to himself and/or others.

A bare fear of death or great bodily injury is not sufficient to justify a killing. To justify taking the life of another in self-defense, the circumstances must be sufficient to excite the fears of a reasonable person placed in a similar situation. The person killing must act under the influence of those fears alone and not in revenge.

An honest but *reasonable* belief in the necessity for self-defense does not negate malice and does not reduce the offense from murder to manslaughter.

The right of self-defense is not available to an original aggressor, that is a person who has sought a quarrel with the design to force a deadly issue and thus through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault.

However, where a person, without voluntarily seeking, provoking, inviting, or willingly engaging in a difficulty of his own free will, is attacked by an assailant, he has the right to stand his ground and need not retreat when faced with the threat of deadly force.

(emphasis added). It is undisputed that the italicized word should have been "unreasonable."[1]

The trial court instructed the jury on first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. "Murder" was defined as "the unlawful killing of a human being, with malice aforethought, either express or implied." In contrast, Instruction 12 provided:

> Voluntary Manslaughter is the unlawful killing of a human being, without malice aforethought and without deliberation or premeditation. It is a killing upon a sudden quarrel or heat of passion, caused by a provocation sufficient to make the passion irresistible.
>
> The provocation required for Voluntary Manslaughter must either consist of a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing.
>
> For the sudden, violent impulse of passion to be irresistible resulting in a killing, which is Voluntary Manslaughter, there must not have

---

[1] The trial court noticed a spelling error in the same instruction — in the last paragraph, "attacked" was misprinted as "attached" — made a handwritten correction to the instruction, and informed the jurors of the correction.

been an interval between the assault or provocation and the killing sufficient for the voice of reason and humanity to be heard; for, if there should appear to have been sufficient time for a cool head to prevail and the voice of reason to be heard, the killing shall be attributed to deliberate revenge and determined by you to be murder. The law assigns no fixed period of time for such an interval but leaves its determination to the jury under the facts and circumstances of the case.

Instruction 13 further stated:

The heat of passion which will reduce a homicide to Voluntary Manslaughter must be such an irresistible passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the irresistible passion of the ordinarily reasonable man if likewise situated. The basic inquiry is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and

> reflection and from such passion rather than from judgment.

The jury found Dixon guilty of second-degree murder with a deadly weapon.[2] Dixon was sentenced to life with the possibility of parole.

Dixon appealed, arguing, among other things, that the self-defense instruction was clearly erroneous. The Nevada Supreme Court affirmed the conviction. It agreed that the jury instruction was erroneous:

> Jury Instruction 19, which attempts to describe[] the standard for self-defense, reads in part: "An honest but reasonable belief in the necessity for self-defense does not negate malice and does not reduce the offense from murder to manslaughter." This is clearly an incorrect statement of the law. The jury instruction should read: "An honest but *unreasonable* belief in the necessity for self-defense does not negate malice and does not reduce the offense from murder to manslaughter."

(emphasis in original). But, applying a harmless error analysis, the Nevada Supreme Court held that the error did not warrant a new trial. It stated,

---

[2] The jury began deliberating at about 7:10 p.m. on Thursday, October 28, 2004, and returned a verdict by 2:32 a.m. on Friday, October 29, 2004. It does not appear that the jurors asked the trial court any questions during their deliberations.

We conclude that this error was harmless. The first four paragraphs of Jury Instruction 19 state correctly that a defendant who reasonably believes there is imminent danger of death or bodily harm may use deadly force to defend himself. The instruction then incorrectly states that an honest but reasonable belief will not reduce a murder charge to manslaughter.

Eyewitnesses testified that the altercation between Dixon and Nunley was over before Dixon shot him. Nunley had put away a knife and was walking back toward his car. Dixon had stepped back from the scene, and the direct physical confrontation was over. The jury heard testimony that Dixon then walked deliberately back to his car, unlocked the door, and grabbed a gun. Dixon then ran over to Nunley's vehicle and shot him repeatedly.

Although one statement in the instruction was incorrect, we conclude beyond a reasonable doubt that, given the totality of the jury instructions and the evidence admitted at trial, the error did not substantially prejudice the jury's deliberations and verdict.

Dixon filed a pro se state post-conviction petition, which the state district court denied. Dixon timely appealed, and the Nevada Supreme Court affirmed the district court's decision.

Thereafter, Dixon filed a pro se federal habeas corpus petition raising the erroneous jury instruction. The district

court denied the petition, holding that the state Supreme Court's denial of the claim on direct appeal was not contrary to, or an unreasonable application of, federal law, and was not based on an unreasonable finding of fact. A panel of this court granted Dixon a certificate of appealability as to "whether the trial court's jury instruction on self-defense deprived appellant of due process." Thereafter, counsel was appointed to represent Dixon on appeal.

## II

A writ of habeas corpus may be issued for a state prisoner only if "he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. §§ 2241(c)(3), 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which applies to Dixon's petition, a federal court may grant a habeas petition with respect to a "claim that was adjudicated on the merits" in state court only if the state's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A district court's decision to grant or deny a petition for habeas corpus under 28 U.S.C. § 2254 is reviewed de novo." *Dows v. Wood*, 211 F.3d 480, 484 (9th Cir. 2000) (citation omitted).

## A

"When considering an allegedly erroneous jury instruction in a habeas proceeding, an appellate court first considers whether the error in the challenged instruction, if any, amounted to 'constitutional error.'" *Evanchyk v.*

*Stewart*, 340 F.3d 933, 939 (9th Cir. 2003) (internal quotation marks and citation omitted). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). But "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Id.* The appropriate inquiry "is whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)) (internal quotation marks omitted). "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)) (internal quotation marks omitted).

"If the charge as a whole is ambiguous, the question is whether there is a 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.* (quoting *Estelle*, 502 U.S. at 72). But this "reasonable likelihood" inquiry does not apply when the disputed instruction is erroneous rather than ambiguous. *See Boyde*, 494 U.S. at 380 (distinguishing situations when the test would apply from those where the instruction at issue was "concededly erroneous [or] found so by a court"); *see also Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003).

When the Nevada Supreme Court addressed the instructional error on direct appeal, it held that the instruction "incorrectly states that an honest but reasonable belief will not reduce a murder charge to manslaughter," and was an "inaccurate statement of the law." In other words, the Nevada Supreme Court held that such a belief in fact *could*

contribute to reducing a murder charge to manslaughter under state law.  That statement of the Nevada Supreme Court is binding on this court, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"), and correctly reflects the underlying law of manslaughter in Nevada.[3]

The error did reduce the State's burden for convicting Dixon of murder instead of voluntary manslaughter.  As correctly noted in the other instructions, "[m]urder is the unlawful killing of a human being, with malice aforethought, either express or implied," but "[v]oluntary manslaughter is the unlawful killing of a human being, without malice aforethought and without deliberation or premeditation."  The instructions also properly explained that voluntary manslaughter "is a killing upon a sudden quarrel or heat of

---

[3] The State's characterization of the Nevada Supreme Court's holding on direct appeal is incorrect.  The State maintains that the Nevada Supreme Court held that the portion of the jury instructions with the error was intended to address the doctrine of imperfect self-defense, which Dixon had not tried to invoke at trial, and the corrected version only tells jurors that this defense is not available in Nevada, so Dixon could not have benefitted from the defense if the jury had been properly instructed. *See Runion v. State*, 13 P.3d 52, 59 (Nev. 2000); *Hill v. State*, 647 P.2d 370, 370–71 (Nev. 1982).  In states that recognize this defense, if a defendant entertained an honest but unreasonable belief in the necessity of self-defense, the greatest charge of which he can be convicted is manslaughter, because such a belief would by itself negate malice, which is a required element for murder. *Hill*, 647 P.2d at 371.

But the Nevada Supreme Court only made this observation "[a]dditionally," and in a footnote.  Its primary holding was that the instruction as actually given contained an incorrect statement of the law regarding murder and manslaughter, as discussed in the text.

passion, caused by a provocation sufficient to make the passion irresistible." They further stated that the required provocation "must either consist of a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or *an attempt by the person killed to commit a serious personal injury on the person killing*." (emphasis added). But because the jurors also were told that an "honest but reasonable belief in the necessity for self-defense . . . does not reduce the offense from murder to manslaughter," the jurors were not permitted to find the second, "serious personal injury" provocation required for voluntary manslaughter even if they determined that Dixon had honestly and reasonably believed that Nunley had attempted or was attempting to kill or seriously physically injure him.

Under state law, such a belief *may* contribute to reducing the murder charge to manslaughter, by helping establish the requisite provocation. The instruction was facially erroneous, because it stated otherwise.[4]   As a result, the kind of provocation that could give rise to manslaughter was improperly limited, even if the other elements of manslaughter were established.   And the error was a constitutional one, as it made more onerous for the defendant, and less onerous for the prosecution, conviction for a lesser rather than a greater offense. *See Cool v. United States*,

---

[4] The jury was given otherwise accurate instructions regarding self-defense.   But those instructions addressed self-defense as a *complete* defense to the killing.   The erroneous instruction, in contrast, dealt with the reduction of the offense from murder to manslaughter by negating malice.   It is the only instruction that directly addressed the relationship of self-defense to this reduction.

409 U.S. 100, 104 (1972); *Mendez v. Knowles*, 556 F.3d 757, 768 (9th Cir. 2009).

B

"Even where constitutional error is found, 'in § 2254 proceedings a court must [also] assess the prejudicial impact of constitutional error' under the *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)] standard." *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011) (quoting *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007)) (first alteration in original). Under *Brecht*, habeas petitioners are entitled to relief if "the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. at 637. As explained by the Supreme Court,

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

*Merolillo*, 663 F.3d at 454 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)) (alteration in original). "Where the record is so evenly balanced that a judge 'feels himself in virtual equipoise as to the harmlessness of the error' and has 'grave doubt' about whether an error affected a jury [substantially and injuriously], the judge must treat the

error as if it did so.'" *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435-38 (1995)) (alteration in original).

The State suggests that Dixon must fulfill both the *Brecht* test and also show "that the Nevada Supreme Court's application of United States Supreme Court law was objectively unreasonable" under AEDPA. But the Supreme Court has "explained that we need not conduct an analysis under AEDPA of whether the state court's harmlessness determination on direct review — which is governed by the 'harmless beyond a reasonable doubt' test set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967) — was contrary to or an unreasonable application of clearly established federal law." *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010) (citing *Fry*, 551 U.S. at 119–20). "This is because the *Brecht* test 'obviously subsumes' the 'more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable.'" *Id.* (quoting *Fry*, 551 U.S. at 120). Thus, "[w]e 'apply the *Brecht* test without regard for the state court's harmlessness determination.'" *Ayala v. Wong*, No. 09-99005, slip op. at 33–34 (9th Cir. Feb. 25, 2014) (quoting *Pulido*, 629 F.3d at 1012). Applying the *Brecht* test, we conclude that the instructional error had substantial and injurious influence on the jury's verdict.

As the Nevada Supreme Court noted, there was testimony that the confrontation between Dixon and Nunley was over and Nunley had retreated to his car by the time Dixon went to his own car, retrieved a gun, ran to Nunley's car and shot him while saying, "That's what you get for pulling a knife on me." But there was other testimony that could have supported a finding of adequate provocation for voluntary manslaughter purposes, had the jury been properly instructed.

Among other evidence, Dixon's younger brother, Gabriel Anderson, who was present throughout the relevant events, testified about dangerous confrontations in different settings, in all of which Nunley, not Dixon, was the aggressor and during all of which Dixon tried repeatedly to de-escalate the situation, only to have Nunley continue his threats and violence.  Anderson described an atmosphere in which the brothers were faced with Nunley and his threatening friends, making him "scared for my life."  In the first parking lot, for example, Anderson saw Nunley hold a box cutter and appear to be ready to use it "to cut or stab" Dixon, a possibility that dissipated only when a security guard intervened.  Also at that location, Anderson witnessed Nunley's friends yelling and screaming threats at Dixon.

In the second parking lot, Anderson heard several people in Nunley's group yelling at him and his brothers, "Going to kill you mother fucker.  You're not getting out of Las Vegas alive.  You mother fuckers are going to die."  He described trying to leave the parking lot for the safety of the casino, only to be prevented from entering by security guards. Anderson then saw Nunley "jump[] out with a knife" and swing it at Dixon, while telling Dixon repeatedly, "I'm going to cut your mother fuckin' face off."  Nunley also threatened Dixon, "You can dodge this knife, but you can't dodge these bullets."  Anderson then saw Nunley "[take] off towards his car."

Dixon's defense counsel argued that Dixon reasonably believed that Nunley was going to his car to retrieve a gun, to follow through on his threat that Dixon would not be able to "dodge" his "bullets."  The defense also maintained that Nunley was not about to leave the scene, based on the

testimony that he had entered the car's passenger side door, not the driver's side, and had left the door open.

That Nunley was the aggressor, and that Dixon was "frightened," "not aggressive" and tried to end the confrontations was corroborated by Nunley's friend, Jermaine Clay. Clay further corroborated many of the threats that Nunley made to Dixon and the intimidating actions taken by Nunley's friends, such as throwing rocks at Dixon and his brothers. Clay also heard Nunley continue to say things to Dixon as Dixon walked toward Nunley's car.

At trial, a psychiatrist testified that, "to a reasonable degree of medical probability, Mr. Dixon interpreted the collective behavior of the victim as an authentic and immediate threat to his life and to the lives of his . . . brothers." The psychiatrist also stated that "Mr. Dixon was convinced that he . . . and his family were in acute danger, vital danger, that he was going to be killed and he acted in accordance with that perception."

In short, although there was also evidence to the contrary, there was considerable evidence the jury could have credited that Dixon had acted with adequate provocation, even though he could not establish the elements of the defense of self-defense and thereby avoid conviction for the killing altogether. In light of the other events, in which Nunley had repeatedly brandished a knife and threatened Dixon, and was the original aggressor, the jurors could have decided that Dixon had an "honest but reasonable belief in the necessity for self-defense," because Nunley had attempted to commit "a serious personal injury on" Dixon, and that insufficient time had passed between the provocation and shooting for the passion thereby provoked to pass and "a cool head to

prevail." Jury Instr. No. 12. Thus, but for the erroneous jury instruction, the jurors reasonably may have convicted on the reduced charge of voluntary manslaughter instead of second-degree murder. "[B]ecause we have 'grave doubt[s] as to the harmlessness of [this] error,' we must rule for the Petitioner." *Cudjo v. Ayers*, 698 F.3d 752, 770 (9th Cir. 2012) (alterations in original).

We note that the outcome is the same under the AEDPA/*Chapman* standard. *Chapman* provides that "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman*, 386 U.S. at 24). Here, the Nevada Supreme Court "conclude[d] beyond a reasonable doubt that, given the totality of the jury instructions and the evidence admitted at trial, the error did not substantially prejudice the jury's deliberations and verdict." Although the Nevada Supreme Court stated that it considered in so concluding "the totality of . . . the evidence admitted at trial," it recited only the testimony that *supported* the verdict and did not acknowledge *any* of the testimony supporting provocation through reasonable fear of serious injury. Proper application of the *Chapman* standard requires consideration of "the trial record as a whole." *Vasquez v. Hillery*, 474 U.S. 254, 269 (1986) (internal quotation marks and citation omitted).

We reverse the district court's denial of Dixon's petition for writ of habeas corpus, and remand with instructions to grant a conditional writ as to the second-degree murder conviction, requiring the State to release Dixon from custody as to that conviction unless the State initiates new trial

proceedings within a reasonable period of time to be determined by the district court.

**REVERSED and REMANDED.**