Opinion by Judge BERZON; Dissent by Judge WALLACE.
OPINION
BERZON, Circuit Judge:
Nancy Mageno’s godson, a leader of a methamphetamine conspiracy, did not speak English fluently, so Mageno translated telephone calls for him. As a result, Mageno was prosecuted for knowingly joining and participating in the drug conspiracy by fostering communication between its participants and her godson. In a separate disposition, we reject Mageno’s argument that the evidence against her was insufficient to sustain the conviction. Here, we consider related issues commendably raised by the government itself on appeal: Did the prosecutors’ several misstatements of fact during the closing argument encourage the jury to convict Mageno on the basis of evidence not presented at trial? If so, is there a reasonable probability that the misstatements affected the outcome? After determining that we should reach these questions although Mageno did not raise them, we answer both questions “yes,” and reverse.
I
Mageno’s godson, Jesus Guadalupe Felix Burgos, his wife, and his young son, lived with Mageno in a two-bedroom apartment in Las Vegas, Nevada. While Burgos lived with her, Mageno served as his informal English-Spanish translator. Drug deals were often the topic of the conversations Mageno translated. When the government indicted Burgos and eight others for conspiring to distribute a controlled substance, it indicted Mageno as well. Mageno was charged with two counts; one alleging that she, Burgos, and others conspired to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(l)(A)(viii) and 846, and the other accusing her of distributing more than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(l)(A)(viii) and 18 U.S.C. § 2, on or about October 7, 2010.
The Drug Enforcement Agency began investigating methamphetamine distribution in the Billings, Montana area with the aid of an undercover officer, Agent Joseph Kirkland. After Kirkland purchased high-grade methamphetamine from two brothers in the Billings area, he traced the brothers’ supplier to Las Vegas. The supplier, Paco Francisco Flores, eventually led Kirkland to Burgos, the individual the government now maintains was at the center of the distribution operation. Burgos identified himself to Kirkland as “Virrio,” invited Kirkland to travel to Las Vegas to *937 buy methamphetamine, and provided Kirkland with a phone number to contact him.
To help develop a case against Burgos and his associates, the government obtained a warrant to tap Burgos’s phone. At Mageno’s trial, the government introduced a total of five intercepted calls involving Mageno:
(1) A September 22, 2010, phone call between an unknown man and Burgos, in which Mageno acted as a translator. The unknown man complained that, “[t]he stuff that I just got is garbage. It’s full of cut.... it’s like, looks like soap. I [cook] this up I look stupid.” An agent testified that this meant the drugs were poor quality and could not be resold. The caller said that he was going to “take ... the rock out of it” and wanted a “return on” the “other stuff.”
(2) An October 1, 2010, phone call between co-defendant John Asher, Burgos, and Mageno. Mageno translated for Burgos, saying to Asher: “He says right now he doesn’t have anything. What he does have is not any good.... They’re waiting for — the new shipment to come in.”
(3) An October 7, 2010, phone call between Kirkland and Burgos, in which Mageno translated as they arranged a meeting. Kirkland called Burgos on that day, the date of the planned Las Vegas transaction. During the call, Burgos had trouble communicating with Kirkland in English so Mageno translated part of the conversation. The questions and responses Mageno translated facilitated the transaction by providing details about Kirkland’s car, location and clothing. Mageno also conveyed a question from Kirkland as to “price,” al~ though Kirkland never specified the “price” was for drugs. Burgos’s response to the “price” question, also translated by Mageno, was, “This time it’s the same price. Next time he can give it to you cheaper because right now they’re having a hard time.”
(4) A November 4, 2010, phone call between an unknown caller and Burgos, with Mageno translating as they arranged a meeting. Mageno translated the unknown caller’s description of his car.
(5) A November 17, 2010, phone call between a caller identified as “Paco”[1] and Mageno, in which Mageno hints that she is concerned that the phone might be tapped: When asked what was happening, Mageno responds that she “can’t say over the phone.”
The evidence at trial also included testimony that on November 17, 2010, just before the last intercepted call, Mageno was driving with Burgos and his family when they realized they were being followed. Mageno confronted the agent monitoring Burgos, demanding, “Why are you following me?” After that encounter, Ma-geno made Burgos and his family leave her apartment. But that was not the end of her relationship with Burgos. Not long after Burgos moved out, Mageno traveled with him and two others, including her son-in-law, to Yakima, Washington, which was asserted by the government to be a “known drug hub.” She, Burgos, and the others were detained by drug enforcement authorities but no drugs were found in their car.
Testifying in her defense, Mageno explained that: she did not know the conversations she translated contained references *938 to drugs and “was under the impression that it had to do with [Burgos’s] work”; she asked Burgos about the phone calls, and he always said the calls had to do with his work as a day laborer; Burgos told her the first call was a complaint about shoddy workmanship in the laying of cement; she understood that when the caller complained that he couldn’t “cook” the product, he was referring to mixing cement in a concrete mixer; Burgos told her the shipment referred to in the October 1 call was a cement purchase; and in translating the October 7 Kirkland call, Mageno thought she was connecting one of Burgos’s workers with an employer, so that the worker could follow the employer to his home for a job.
Also, according to Mageno: she did not know Burgos was dealing drugs until the events of November 17, when Burgos admitted his involvement when they realized they were being followed; the reason she was hesitant to speak to Paco later that day was because she did not know Paco well and he was her son’s romantic rival, not because she feared the phone was tapped; and, as to the trip to Yakima, she was told its purpose was to visit a relative, not to deal drugs.
Testifying at Mageno’s trial in her defense, Burgos said Mageno was “an innocent person,” and “it wouldn’t be fair for her to be judged by the crimes another person has done.” He confirmed that he told Mageno they were going to Yakima to visit an ill relative, but denied that Mageno asked him questions about the phone calls she interpreted.
On cross examination, the government questioned Burgos about a prior, drug-related deportation. After he testified that he lived with Mageno for about a year in 2007 before being deported, the government asked whether Mageno knew why he was deported. Mageno’s attorney objected on the ground that the answer called for speculation. After a sidebar discussion,[2] the government agreed to ask “[j]ust one question” of Burgos concerning his deportation, and the prosecutor did so, asking, “Mr. Burgos, going back to ... 2007, the reason why you were deported was because you were trafficking in methamphetamine, isn’t that right?” Burgos answered in the affirmative, and the government moved on. But Burgos never said that Mageno knew that he was deported or why, and neither did Mageno— she was never asked.
This truncated line of questioning was transformed into a centerpiece of the closing arguments. The prosecution argued that Mageno knew that Burgos had been deported for drug trafficking, and so must have known the calls she translated related to drug trafficking:
There’s one [version of events] that the big, bad government has looped Nancy Mageno unfairly into this large, multi-state drug conspiracy all because she accidentally got on a couple of phone calls where she thought she was assisting in cement sales and pool cleaners and coordinating day laborers who were having clandestine meetings in parking lots of In-and-Out Burgers. That’s one story.
And there’s another one. There’s a second story and that’s that, like every individual walking the streets, she had a choice. She had a choice whether to let her godson who she already knew had been deported for distributing methamphetamine move in with her. She had *939 that choice. She had a choice whether or not to get on the phone and begin translating phone calls that dealt with cut and shipments and coordinating these meetings.
She had these choices and she’s the one who made the choice to get on those phones. She is the one who made the choice to help her godson, Virrio, the one who had already been deported for distributing methamphetamine. That is the second story line of this case. That is what this case is about. (Emphasis added.)
The prosecutor went on specifically to ask the jury to infer Mageno’s knowledge of what she was translating from her supposed knowledge of Burgos’s prior drug-related deportation. The prosecutor first told the jury that, “Virrio explained to you she knew because he was living with her, then he comes back[,]” and later described Mageno’s voice on the phone as the voice of a person who “already in her head knew that Virrio, the person she was translating for, has a history of distributing methamphetamine.” The prosecutor concluded his closing argument on this same note: The jury should find Mageno was guilty because Mageno “knew she was translating for a known methamphetamine dealer.” On rebuttal, a second prosecutor picked up the theme: “[I]n 2007, she already knows. Is it past is prologue? He’s been deported because he was trafficking methamphetamine while he was living with her. He testified she knew why he was deported.”
Mageno’s attorney also misstated Bur-gos’s testimony — perhaps as a result of hearing the government’s argument — but not as assuredly:
Now, [Burgos] said on the stand, and I’m not a hundred percent sure, it’s either one or two things. He either said, I was deported and she knew about it, or she knew why I was deported, but the question is how would he know she knew why? Did he come up and say, hey, by the way, I’ve been dealing drugs, you know, and I’m gone?
In fact, Burgos had testified neither that Mageno knew he was deported nor that she knew why.
A jury convicted Mageno on the conspiracy charge, count one, but acquitted her of the other count against her, the October 7, 2010 methamphetamine distribution. The district court sentenced Mageno to 87 months in prison, followed by five years of supervised release.
II
Mageno’s central argument before us is that the government did not introduce sufficient evidence to support the jury’s verdict on the conspiracy charge. The government maintains that the evidence was sufficient, and we agree.[3] But, commendably, the government raises, as a separate error, the prosecutors’ repeated misstatements during closing argument that Bur-gos had testified to Mageno’s knowledge of Burgos’s deportation for dealing drugs.
Mageno did not object to the government’s misstatement of Burgos’s testimony at trial, did not raise this argument in her opening brief, and did not adopt it as a ground for reversal until oral argument. Should we consider the government’s error under these circumstances? We conclude that we should.[4]
*940 Generally, an issue not raised before the district court may not be considered for the first time on appeal. See United States v. Robertson, 52 F.3d 789, 791 (9th Cir.1994); see also Manta v. Chertoff, 518 F.3d 1134, 1144 (9th Cir.2008). But there are exceptions, of which one is where “plain error has occurred and an injustice might otherwise result.” United States v. Flores-Montano, 424 F.3d 1044, 1047 (9th Cir.2005) (per curiam) (quoting Robertson, 52 F.3d at 791); see also Gaither v. United States, 413 F.2d 1061, 1079 (D.C.Cir.1969) (recognizing that courts “have noticed [prosecutorial] errors where they were not objected to at trial, or even on appeal”).
Federal Rule of Criminal Procedure 52(b) provides that “[a] plain error that affects substantial rights may be considered even though it was not brought to the court’s attention.” As laid out in United States v. Olano, “Rule 52(b) review-so-called ‘plain-error review’ — involves four steps,, or prongs’’: (1) “there must be an error or defect ... that has not been ... affirmatively waived[] by the appellant”; (2) “the legal error must be clear or obvious, rather than subject to reasonable dispute”; (3) “the error must have affected the appellant’s substantial rights”; and (4) “if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error ... if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009) (internal quotation marks and emphasis omitted; final alteration in original) (citing United States v. Olano, 507 U.S. 725, 732-36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). As will appear, we conclude that all of these requisites are met.
Mageno’s failure to raise the governments’ misstatements in her opening brief on appeal does not, in this unusual instance, affect our application of the plain error doctrine. Generally, an issue not raised in an opening brief will not be considered. See e.g., McKay v. Ingleson, 558 F.3d 888, 891 n. 5 (9th Cir.2009); Stivers v. Pierce, 71 F.3d 732, 740 n. 5 (9th Cir.1995); United States v. Martini, 31 F.3d 781, 782 n. 2 (9th Cir.1994) (per curiam). But that principle admits of exceptions. We consider an argument not raised in an opening brief if: (1) there is “good cause shown,” or “failure to do so would result in manifest injustice”; (2) the issue is raised in the appellee’s brief; or (3) failure to properly raise the issue does not prejudice the defense of the opposing party. United States v. Ullah, 976 F.2d 509, 514 (9th Cir.1992) (citations and internal quotation marks omitted). Here, the second and third circumstances exist and justify our reaching the issue.[5]
As to the second justification, we consider arguments not raised in the opening brief when addressed in the appellee’s response; an appellee’s brief that merely observes that an appellant failed to raise an issue is insufficient. See Eberle v. City of Anaheim, 901 F.2d 814, 818 (9th Cir.1990). The key inquiry is whether “the discussion of the issue in [the] briefs is *941 sufficient to permit an informed resolution of the dispute and its application [to the appellant].” Ullah, 976 F.2d at 514.
The third consideration, lack of prejudice to the opposing party, is closely related to the second. Where the party opposing an appeal has "fully addressed the issue” in its briefing, the appellant’s failure to raise the issue in an opening brief generally will “not impair the government’s position on appeal,” and the government will not, therefore, be prejudiced by the court’s consideration of the issue. Id.
Here, the government raised the prose-cutorial misstatements issue in its answering brief. The government’s brief cited Burgos’s testimony at length, and acknowledges that four government statements made in closing misstated that testimony. The government also argued that the court should not reverse in spite of this error and cited: (1) the lack of bad faith by the government; (2) the lack of a contemporaneous objection; (3) the judge’s general admonition that comments by lawyers in closing are not evidence, and that the jury must decide the facts for itself; and (4) the claim’s failings on plain error review. In all, the discussion of the issue spans six pages.
Given the government’s ample discussion of its error, the government sufficiently addressed the issue of the prosecutors’ misstatements to allow for that issue’s full exploration on appeal. For the same reason, the government is not prejudiced by our consideration of the issue on appeal.[6]
In arguing to the contrary, our dissenting colleague faults us for “creat[ing]” an alleged “new exception,” pursuant to which we purportedly are “considering an argument raised for the first time ... by a member of our panel hearing argument.” Dissent at 30. But the preceding analysis should make clear that our conclusion that we may reach the prosecution’s misstatements despite Mageno’s failure to raise the issue in her opening brief turns on the government’s having canvassed the issue at length in its response, and the lack of prejudice to the government from consideration of the issue the government itself raised — not on the appellant’s embrace of the error when questioned at argument. Accordingly, have no need to create a new exception, as it is already well-established that we may consider an issue raised for the first time by an appellee. Affordable Hous. Dev. Corp. v. City of Fresno, 433 F.3d 1182, 1193 (9th Cir.2006).
Considered in this light, the significance of Mageno’s adoption of the issue at oral argument is that Mageno, not this court or the government, is the master of her appeal. Mageno could have purposely argued sufficiency of the evidence and no other issue for strategic reasons, because she wanted a reversal only if no retrial would occur. By checking to assure that that was not the case, we did not circumvent the precept that we usually consider only issues raised in the briefs. Again, the prosecutorial misconduct issue was raised in the briefing, albeit by the government.
Moreover, even if an issue is not adequately raised in the briefing, we are not precluded from addressing it. Rule 52(b) says nothing about issues reviewed for *942 plain error having to be raised by the parties. And Rule 52(b) applies on appeal, to errors that became plain only on appeal. Henderson v. United States, — U.S. -, 133 S.Ct. 1121, 1127, 185 L.Ed.2d 85 (2013).
Furthermore, Rule 52(b) was meant as a “restatement of existing law.” Fed. R.Crim.P. 52(b) advisory committee’s note (1944 adoption). The Supreme Court has long recognized — before Rule 52(b) came into existence — that “[i]n exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.” United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936) (emphasis added).
The Supreme Court has itself reversed for plain error where an issue was “not presented to the Court of Appeals and was not briefed or argued” to the Supreme Court. Silber v. United States, 370 U.S. 717, 717, 82 S.Ct. 1287, 8 L.Ed.2d 798 (1962) (per curiam). To do so, the Court relied in part on the principle that “the court, at its option, may notice a plain error not presented”[7] — a principle stated in language markedly similar to the language of Rule 52(b), which the Court also cited. Id. at 718, 82 S.Ct. 1287. Justice Kennedy has likewise noted that while “[i]n most cases ... the party will have raised the alleged error on appeal,” sometimes “a court notices an error on its own initiative under Federal Rule of Criminal Procedure 52(b).” Olano, 507 U.S. at 741-42, 113 S.Ct. 1770 (Kennedy, J., concurring) (citing Silber, 370 U.S. at 718, 82 S.Ct. 1287).
In short, when a government representative concedes that there was a substantial error in the trial court proceedings involving prosecutorial conduct, and we conclude that the plain error standards laid out in Olano are otherwise met— including that “the error seriously affects the fairness, integrity or public reputation of judicial proceedings,” 507 U.S. at 736, 113 S.Ct. 1770 (internal quotation marks and alteration omitted), we may consider the error and, if otherwise appropriate, reverse the conviction.[8]
*943 Counseling in favor of exercising that authority in this instance are two primary considerations: first, that the issue was raised, and briefed, by the appellee; and second, that this is not only a criminal case, see Atkinson, 297 U.S. at 160, 56 S.Ct. 391, but one in which a government representative’s error is at issue. We conclude that despite Mageno’s failure to raise the prosecutorial misstatements in her briefs as a ground for reversal, this case is one in which we may reverse for plain error if the Olano standards are met.[9]
III
Addressing the Olano factors, we conclude that all the factors are met.
First, for us to reverse the jury verdict in this case, there must be error that is plain. Olano, 507 U.S. at 732-34, 113 S.Ct. 1770.
Criminal defendants have a constitutional right “not to be convicted except on the basis of evidence adduced at trial.” United States v. Schuler, 813 F.2d 978, 980 (9th Cir.1987). Accordingly, it has long been the rule in this circuit that prosecutors “must refrain from introducing evidence not in the record.” United States v. Artus, 591 F.2d 526, 528 (9th Cir.1979) (per curiam). Indeed, in light of their status and stature as representatives of the government, prosecutors have an affirmative “obligation ... to avoid making statements of fact to the jury not supported by proper evidence introduced during trial.” Gaither, 413 F.2d at 1079.
Prosecutors are free in argument to suggest that the jury make “reasonable inferences” from the evidence presented at trial. United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir.1997). But even in circumstances where it would be reasonable for a prosecutor to argue and for the jury to make a certain inference from the evidence presented, prosecutors must not during closing argument flatly misstate testimony so as to make it appear that the permissible inference was affirmatively stated by a witness. See United States v. Gray, 876 F.2d 1411, 1417 (9th Cir.1989); United States v. Small, 74 F.3d 1276, 1280-82 (D.C.Cir.1996). We have thus made plain that when a prosecutor “ma[kes] unsupported factual claims.... [it] is definitely improper.” United States v. Kojayan, 8 F.3d 1315, 1321 (9th Cir.1993).
The prosecutors’ statements at the close of Mageno’s trial misstated important evidence and did so repeatedly. The clearest instance of the government’s error came on rebuttal, when the second prosecutor *944 told the jury: “[Burgos] testified [Mageno] knew why he was deported.” Burgos had not testified to this fact. Although the prosecutor asked if Mageno knew why he was deported, he never answered that question, nor did he testify that Mageno knew that he was deported.
The first prosecutor, in several other statements, referred to Mageno’s knowledge of Burgos’s criminal past. He did not ask the jury to so infer. He did not use an “introductory phrase,” such as “I submit,” to “alert[ ] the jurors that defense counsel was not stating a fact, but asking them to use their common sense in drawing an inference.” Id. at 1321. Instead, as the second prosecutor’s later direct misstatement of Burgos’s testimony would have confirmed to the jury, the earlier references sounded like, and were likely to be taken as, assertions of fact based on direct testimony.[10]
Up to this point, the government agrees. The government recognizes that the following statements made in the initial closing argument, as well as the already identified statement made in rebuttal, amount to error: “[Mageno] ... let her godson who she already knew had been deported for distributing methamphetamine move in with her”; “[Burgos] was arrested and deported for distributing methamphetamine. This is something [Burgos] explained to you she knew because he was living with her”; and, “That’s the voice on the phone that already in her head knew that the person she was translating for, has a history of distributing methamphetamine.” To this list, we add one more: The government’s statement that Mageno “knew she was translating for a known methamphetamine dealer.”[11]
That the prosecutors’ statements during closing argument were improper is therefore plain.
Second, as we are conducting plain error review, we must ask if the errors affected Mageno’s “substantial rights,” i.e., whether they were sufficiently prejudicial that there exists a “a reasonable probability that the error[s] affected the outcome of the trial.” Marcus, 560 U.S. at 262, 130 S.Ct. 2159. We may reverse on plain error review “only if the prosecutor[s’] improper conduct ... tainted the verdict and deprived [Mageno] of a fair trial.” United States v. Sanchez, 659 F.3d 1252, 1257 (9th Cir.2011) (citation and internal quotation marks omitted). We consider the statements in the context of the entire trial, including curative instructions given to the jury and the weight of the evidence against the defendant, to as *945 certain the statements’ likely effect.[12] Id.; United States v. Weatherspoon, 410 F.3d 1142, 1151 (9th Cir.2005).
The comments at closing clearly misstated evidence, by explicitly and implicitly stating, five times in all, that Burgos testified that Mageno knew he was previously deported for drug trafficking. Misstating the evidence from trial is a particularly prejudicial form of misconduct, because it distorts the information the jury is to rely on in reaching a verdict. Cf. Darden v. Wainwright, 477 U.S. 168, 181-82, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). By doing so, it also usurps the jury’s prerogative of drawing, or not drawing, otherwise permissible inferences.
In addition, the trial judge did not admonish the jury to disregard these misstatements. Although the judge gave the standard instructions that statements from lawyers are not evidence, and that the jury is to rely on its own recollection of the evidence at trial, these instructions were never expressly tied to the misstatements. See United States v. Combs, 379 F.3d 564, 575 (9th Cir.2004); United States v. Kerr, 981 F.2d 1050, 1054 (9th Cir.1992). “[T]he standard judicial caution that the jury’s recollection controls” is not a “cure-all,” Gaither, 413 F.2d at 1079, especially where, as here, repeated misstatements of fact went uncorrected. Because Mageno’s attorney did not catch the government’s error, the jury likely accepted the government’s characterization of the evidence as a given. And if the jury’s own recollection of Burgos’s testimony differed from the prosecutors’ recitation, the jury likely would have speculated that the prosecutors’ misstatements had at least some factual basis — that is, that the prosecutors knew the statement was so, even if there was no such testimony.[13]
Moreover, the erroneous comments featured prominently in both government closing arguments, including the last plea the members of the jury heard in the primary closing argument. An error that is “emphasized ... during [a] trial” is more likely to influence a jury. See Roger J. Traynor, The Biddle of Harmless Error 75 (1970). Here, in his very last statement to the jury, the first prosecutor tied that erroneous fact directly to the central issue in the case, telling the jury that Mageno was guilty because she “knew she was translating for a known methamphetamine dealer.” (Emphasis added.) The second prosecutor reiterated the erroneous statement by Burgos, this time explicitly, during rebuttal. The prominence the government afforded its description of the nonexistent testimony in its closing arguments reflects the critical role the point was meant to play in convincing the jury *946 that Mageno knew Burgos had been involved in drug activity when she translated his calls.
In short, this is not a situation in which the “potential prejudice of the prosecution’s comments was mitigated” because “the comment did not pervade the proceedings and was not emphasized.” Hein v. Sullivan, 601 F.3d 897, 916 (9th Cir.2010).
The misstatement of the evidence was also important in its effect on Mageno’s defense, and in its connection to the other evidence before the jury. The defense conceded that there was a conspiracy to distribute narcotics in the amount alleged by the government, putting its eggs instead in the “knowledge” basket. Mageno insisted that she was Burgos’s dupe — she was used to translate purposely opaque conversations and was lied to about their content. Consistent with that defense, Mageno’s counsel during closing argument characterized the central question in the case as, “What did she know[,] and when did she know it?” And again: “[D]id she know what was happening and was it her intention to further this conspiracy?” Defense counsel repeatedly argued in closing that (1) Mageno did not know that the coded conversations she translated were about drug activity; (2) that at the time she translated the conversations she believed that they “had to do with cement”; and (3) that Mageno first learned Burgos was involved in drug trafficking on November 17, when Burgos and Mageno were being followed (Mageno wanted to know why they were followed, and Burgos told her why).
To buy Mageno’s explanation, the jury had to believe that Mageno would not have known or suspected her godson’s involvement in the drug trade. If she knew or suspected that involvement, her insistence that she believed the discussions were about day laborers and cooking cement would be decidedly less credible. And for Mageno, who testified in her own behalf, her credibility was critical. By misstating Burgos’s testimony to include the assertion that Mageno knew of Burgos’s prior drug trafficking — methamphetamine trafficking in particular — the prosecutors vastly decreased any likelihood that the jury would believe her.
The prosecutors’ misstatements may have also confused defense counsel. There was no break between the government’s initial closing argument and the defense argument. Defense counsel followed the government’s lead in misstating Burgos’s testimony, although with the caveat that he was not sure Burgos did say that Ma-geno knew the reason for the deportation. Then, feeling that he had to poke holes in the foundational basis for Burgos’s nonexistent testimony, defense counsel launched a weak counterattack, arguing: “[T]he question is how would he know she knew why? Did he come up [to her] and say, hey, by the way, I’ve been dealing drugs, you know, and I’m gone?” Defense counsel thereby challenged the credibility of its own key witness, Burgos, who had stated that Mageno was “an innocent person.” To attack Burgos’s credibility on the basis of something he did not say likely damaged the defense overall, by undermining Burgos’s general corroboration of Ma-geno’s version of events.[14]
*947 Lacking any direct evidence, the government’s case against Mageno relied solely on circumstantial evidence—principally, the content of -the phone calls Mageno translated and the trip to Yakima—and argued that the jury should infer that she had to know the topics discussed in the phone calls were illicit. Aside from the misstated testimony, there was no direct evidence of Mageno’s knowledge of drug trading, let alone involvement in it. As her lawyer pointed out in closing: “Mage-no never bought drugs, never brought drugs, never sought drugs. She never sold drugs.... She never even had drugs. No witness testified that she had any drugs because she didn’t.” That summary is accurate: The government presented no evidence that Mageno was ever in the presence of drugs. And drugs were never explicitly mentioned in the phone calls Ma-geno translated, not once. In a case based entirely on inference, the government’s bald assertion that Burgos “testified [Ma-geno] knew” that he was deported for methamphetamine trafficking stands alone as powerful, direct evidence that Mageno knew about Burgos’s history of involvement in the drug trade, and so must have known what was going on in the phone calls. “Is ... the past ... prologue?” the prosecution asked in its rebuttal argument, driving home this theme in its final presentation to the jury.
Furthermore, had the statement about Mageno’s knowledge been made, it would almost surely have been believed. Burgos was testifying in Mageno’s defense, presumably would want to help his godmother’s case, and so had-no motive to lie about what she knew concerning his prior drug trafficking history.
Weighing all the above factors, we conclude that the government’s misstatements likely prejudiced the outcome of Mageno’s trial. The plain error substantial rights requirement was therefore, met.
Finally, we consider whether “the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.” Marcus, 560 U.S. at 262, 130 S.Ct. 2159. “An error may ‘seriously affect the fairness, integrity or public reputation of judicial proceedings' independent of the defendant’s innocence”; “[c]onversely, a plain error affecting substantial rights does not, without more, satisfy [this] standard.” Olano, 507 U.S. at 736-37, 113 S.Ct. 1770. We have already observed that the likelihood that the error in this case affected the outcome is high. We further conclude that the type of error that occurred is the something “more” that satisfies the fourth prong of the plain error analysis: By repeatedly stating that a key witness gave damaging testimony that he did not in fact give, the prosecution encouraged the jury to convict Mageno on the basis of the prosecution’s own statements, rather than on evidence adduced during trial. This error seriously impeded the jury’s ability to function as an impartial fact-finder, thereby affecting the fairness and integrity of judicial proceedings.
The government and our dissenting colleague suggest that the fourth prong of plain error review is not met, because the prosecution did not intentionally misstate the evidence during closing argument. We reject this contention for two reasons.
First, our “warrant” to address prosecutorial error “arises from the defendant’s broad right to a ‘fair trial’ guaranteed by the Due Process Clause[,]” Weatherspoon, 410 F.3d at 1152 (Trott, J., concurring in part, dissenting in part), and “the touchstone of due process analysis ... is the fairness of the trial, not the *948 culpability of the prosecutor.” Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Prosecutorial misstatements can constitute error “even where ... they were apparently made in good faith.” Gaither, 413 F.2d at 1079; see Bennett L. Gershman, Mental Culpability and Prosecutorial Misconduct, 26 Am. J.Crim. L. 121, 122-25 (1998) (observing, after surveying the case law, that courts generally apply an objective approach to claims of prosecutorial misconduct, and “do not consider a prosecutor’s intent to violate a trial rule”). For example, we have held a prosecutor’s invocation of personal knowledge “unquestionably improper,” even while “recognizing] the difficulty in identifying errors absent an objection,” and even while “commending] the United States Attorney” for “conceding] ... the error” on appeal. United States v. Rangel-Guzman, 752 F.3d 1222, 1225 (9th Cir.2014). And, as already stated, such misstatements are a type of error that where possibly determinative can affect the fairness and integrity of a jury trial, regardless of a prosecutor’s subjective intent.
Second, while the misstatements here do not rise to the level of intentional misconduct, they were exceedingly reckless, and paid too short shrift to the prosecutors’ “obligation” to seek a conviction only on the basis of facts in the record. Gaither, 413 F.2d at 1079. If the prosecutors were unsure about what Burgos actually testified to, they should have qualified their statements accordingly—especially on rebuttal, after defense counsel questioned whether Burgos did testify that Mageno knew the reason he was deported.
The prosecutor in United States v. Carrillo, 16 F.3d 1046, 1050 (9th Cir.1994), for example, misstated a fact on which the defense placed much significance. But the prosecutor prefaced his misstatement by saying, “I may be wrong, and your recollection controls, but I thought ...and followed the misstatement by reminding the jury that, “[a]gain, your recollection controls.” Id. Here, in contrast to Carrillo, the prosecutors chose to rely heavily on their own recollection of the testimony of a witness whom they had not themselves used in their ease in chief. By doing so, they took the risk that their recollection of the evidence would prove erroneous—as it did. And then the second prosecutor exacerbated the problem by relying on the mistake in rebuttal—“He testified she knew why he was deported.”
“Evidence matters; closing argument matters; statements from the prosecutor matter a great deal.” Kojayan, 8 F.3d at 1323. Although there is no evidence that the prosecutors’ misstatements were intentional, we nonetheless conclude that the error seriously affected the fairness of Ma-geno’s trial.[15]
In sum, based on our review of the case against Mageno, we find it reasonably probable that she was convicted based on the prosecutors’ false account of Burgos’s testimony. We commend the government for bringing the missteps in this case to our attention. While it could be said that our decision to reverse is proof of the old adage that “no good deed goes unpunished,” we do not see it that way. “[L]awyers representing the govern *949 ment in criminal cases serve truth and justice first.” Id. Prosecutors have a special responsibility to provide “those accused of crime a fair trial.” Id. (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 648-49, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (Douglas J., dissenting)). By acknowledging its error on appeal, the government has performed this function admirably. But the government also created the problem, and we will, therefore, reverse Mageno’s conviction so that she may have an untainted shot at maintaining her innocence without the prosecution’s damaging misstatements.
REVERSED AND REMANDED.

. It is not clear whether the “Paco” on this phone call was the same Paco who was involved with the drug distribution conspiracy.

. At the sidebar, the district court incorrectly asserted, about Burgos’s testimony, "He said she knew.”

. The sufficiency issue is addressed in a memorandum disposition filed concurrently with this opinion.

. In a recent case presenting a similar prose-cutorial error, the government also came forward and acknowledged its error, but, unlike here, it did not do so until the en banc stage and after repeated questioning. See United *940 States v. Maloney, No. 11-50311, 755 F.3d 1044, 2014 WL 801450 (9th Cir. Feb. 28, 2014). We reversed on the basis of the government’s concession, even though the issue presented to us in the opening brief was whether the appellant was denied surrebuttal argument improperly. Id. at 1046, 2014 WL 801450 at *1 n. 1.

. Because two of the justifications for addressing an issue not raised in an opening brief apply, we do not consider whether this is a case involving "manifest injustice.” Ullah, 976 F.2d at 514 (internal quotation marks omitted).

. Our dissenting colleague maintains that the government was prejudiced because it "did not have the opportunity to brief fully the precise issue reached by the majority.” Dissent at 952. This is a curious statement, because the government devotes six pages of its brief to the error and makes several merits arguments against reversal.
In addition, both parties recited the trial evidence at length for other purposes, rendering our assessment of the impact of the prose-cutorial misstatements well-informed.

. Silber cites Revised Rules of the Supreme Court of the United States, Rule 40(l)(d)(2), 28 U.S.C., which now appears with only slight modification at Rule 24. 370 U.S. at 718, 82 S.Ct. 1287. Noting that Rule 52(b) restates the existing law, the Advisory Committee Notes from the 1944 Adoption of Rule 52 in turn reference the same Revised Rule, as well as "[s]imilar provisions ... in the rules of several circuit courts of appeals.”

. Our dissenting colleague is of course correct that circumstances such as these do not present themselves very often. But, they are not so rare as the dissent insists. See, e.g., United States v. Sum of $185,336.07 U.S. Currency, 731 F.3d 189, 195 (2d Cir.2013) (vacating and remanding forfeiture order even though appellant "did not raise this argument in the District Court or on appeal”); United States v. Whitfield, 590 F.3d 325, 347 (5th Cir.2009) (citing United States v. Musquiz, 445 F.2d 963, 966 (5th Cir.1971) (reversing a conviction for insufficient evidence on a basis not advanced in the district court or on appeal)); United States v. Gonzalez, 259 F.3d 355, 359 (5th Cir.2001) (vacating sentence for plain Apprendi error not raised by the defendant, but raised by the government "in the interest of candor”); United States v. Granados, 168 F.3d 343, 346 (8th Cir.1999) (reversing and remanding sentence although defendant "failed to raise these arguments in the district court or before this court”); United States v. Pineda-Ortuno, 952 F.2d 98, 105 (5th Cir.1992) (vacating co-defendant's sentence even though he did not "raise[] the issue in the trial court or on appeal,” and holding that "[flairness as well as judicial economy dictate that we address now this issue that would doubtless otherwise be raised in a subsequent habeas proceeding”); United States v. Mur *943 phy, 762 F.2d 1151, 1155 (1st Cir.1985) (reversing conviction where error not raised before trial court and not raised on appeal until oral argument); United States v. McKinney, 707 F.2d 381, 383 (9th Cir.1983) (holding defendant’s rights under the Confrontation Clause were violated and reversing the judgment even though "[t]he sixth amendment issue was not raised in the district court and was neither briefed nor argued in this court”).

. Our dissenting colleague insists that even if we may review for plain error now, we should exercise our discretion not to, because Mage-no could raise the issue — actually, an ineffective assistance of counsel variant of it — in habeas corpus proceedings under 28 U.S.C. § 2255. We need not now decide whether punting an otherwise ripe issue from a direct appeal to habeas corpus review is ever justified. In this case, where the government has conceded its error, the issue is briefed, and the record complete, the greater injustice is to require a defendant to wait in prison one, two, three or more years longer to get to the same result. Nor is such a circuitous method necessarily desirable from the government’s perspective, as the inevitable retrial is only pushed back further, and the difficulty of finding witnesses with fresh recollections compounded.

. Any inference would have been fairly weak from the actual evidence, which did not even directly establish that Mageno knew of the deportation. Mageno's knowledge of Bur-gos’s deportation could have been inferred from her closeness to Burgos, but establishing knowledge of the reason for the deportation would then require an inference from an inference.

. Our dissenting colleague accepts, as he must, that the prosecution made one misstatement, but protests that the first four times the prosecution made the same point less explicitly, the statements were just requests for inferences from other facts of record. Dissent at 958. The government did not in its own review of the record see the statements that way. It recognized in its brief that there were several "incorrect statements ” (emphasis added) and cited to three of the statements that our dissenting colleague insists were proper. Moreover, the dissent’s view is belied by the statements themselves, which do not request that the jury infer the facts stated but recite them as having been affirmatively established. While the government could have "invite[d],” Kojayan, 8 F.3d at 1321, the jury to infer that Mageno knew about Bur-gos’s deportation and provided argument concerning the facts favoring such an inference, id., it did not do so.

. Our dissenting colleague distorts this analysis by applying the Jackson v. Virginia standard for reviewing the sufficiency of the evidence to an analysis of prosecutorial misstatements during closing argument. 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Our "presum[ption] ... that the trier of fact resolved ... conflict[ing inferences] in favor of the prosecution,” Dissent at 958 (quoting Jackson, 443 U.S. at 326, 99 S.Ct. 2781), applies in the sufficiency-of-the-evidence context, not the prejudicial error context. When we review the effect that an error had on the outcome of a criminal jury trial, we “must consider the probable effect the prosecutor’s response would have on the jury’s ability to judge the evidence fairly.” United States v. Young, 470 U.S. 1, 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). In doing that, we do not presume that the jury took the view of the evidence most favorable to the government, as it may well not have done so. See, e.g., Dixon v. Williams, 750 F.3d 1027, 1036 (9th Cir.2014) (per curiam).

. For that reason, assuring the jury that facts not in evidence support the government's case, in addition to constituting trial error, can violate a defendant’s right to due process. See Combs, 379 F.3d at 574.

. Our dissenting colleague thinks we should hold Mageno’s attorney's feet to the fire for failing to object to the prosecution's misstatements and then echoing the prosecution’s errors in his closing. Dissent at 961-62. But the dissent’s contention that Mageno’s attorney "introduced” the error, Dissent at 949-50, misconstrues the record: The government acknowledges it misstated Burgos’s testimony three times before Mageno's attorney approached the lectern. And Mageno’s attorney never committed himself to the most incrimi *947 nating statement from the prosecution—that Mageno knew why Burgos was deported.

. By pointing out that the government was reckless, we do not suggest that recklessness or any other level of prosecutorial culpability is a prerequisite to a determination that the error seriously affects the fairness, integrity or public reputation of judicial proceedings, relevant though it may be. See Marcus, 560 U.S. at 262, 130 S.Ct. 2159. However, such culpability can justify dismissal of an indictment as a sanction, a remedy we find unnecessary here. See Kojayan, 8 F.3d at 1325.